BINGHAM v. WALKER BROS., BANKERS.

No. 4831. Decided November 7, 1929. (283 P. 1055.)
Rehearing Denied January 16, 1930.

*Ball, Musser & Mitchell,* of Salt Lake City, for appellant.

*J. D. Skeen,* of Salt Lake City, for respondent.

EPHRAIM HANSON, J.

Elias W. Crane died intestate December 19, 1925. The plaintiff, Sanford L. Bingham, was appointed administrator of the estate of the deceased January 10, 1927, by order of the district court of Utah county, state of Utah. As such administrator he brought this action in the district court of Salt Lake county against Walker Bros., Bankers, administrator of the estate of Lewis Merriman, deceased, to have 3,628 shares of stock in the Chief Consolidated Mining Company adjudged to be the property of the estate of Elias W. Crane, deceased, and also to recover from the defendant the money which the defendant is alleged to have received from the mining company as dividends on the stock. In this connection the plaintiff avers that at the time of his death Elias W. Crane was the owner of the mining stock in question; that it had been issued in three certificates in the name of Lewis Merriman; and that the certificates were by Merriman indorsed in blank and one of them for 3,428 shares was

in possession of James H. Norman, who held the same as collateral security for the payment of three promissory notes in the aggregate sum of $2,500 from Crane to Norman; that the other two certificates of stock for 100 shares each were held by Merriman for the use and benefit of Crane. Plaintiff further avers that Merriman died intestate May 15, 1926, and that when the defendant, Walker Bros., Bankers, was appointed administrator of his estate, it took possession of the certificates for the 200 shares of stock and that it has collected dividends on all of the stock amounting to $794.70.

The defendant does not seriously deny that the ownership of the stock is in the Crane estate. At the trial of the case the defendant assumed the burden of going forward with the proof, and it seems that the principal controversy grows out of the counterclaims interposed by the defendant to the plaintiff's complaint. The defendant has interposed three such counterclaims. For its first counterclaim, the defendant alleges that on and between August 8, 1921, and May 8, 1925, Lewis Merriman loaned to Elias W. Crane $2,020.45 on divers dates and in various amounts as follows:

| | |
|---|---:|
| August 8, 1921 | $1,000.00 |
| August 21, 1921 | 67.75 |
| October 21, 1921 | 500.00 |
| February 6, 1922 | 3.60 |
| July 1, 1922 | 26.60 |
| July 3, 1923 | 97.50 |
| September 4, 1923 | 22.00 |
| October 2, 1923 | 28.00 |
| November 8, 1923 | 25.00 |
| September 16, 1924 | 25.00 |
| November 22, 1924 | 35.00 |
| November 4, 1924 | 100.00 |
| November 8, 1923 | 50.00 |
| May 8, 1925 | 40.00 |
| Total | $2,020.45 |

—which the defendant promised to pay with interest on demand, but that no part thereof has been paid except the

sum of $794.94 which was credited pro rata on the first three items; that as collateral security for the payment of such indebtedness Crane issued the certificates of stock to Merriman. It is also alleged that the claim was presented to the plaintiff in due time, but that the same was denied July 13, 1927.

As a second counterclaim it is alleged by the defendant that after Crane's death, and before an administrator of his estate had been appointed, Merriman, at the request of Crane's widow, employed counsel to negotiate a settlement of certain asserted claims and demands on the part of John B. McMillan against the Crane estate; that such services were reasonably worth the sum of $125; that the Merriman estate is obligated to pay this sum; and that a claim for this amount was also presented to the plaintiff in due time and the same was denied July 13, 1927.

As a third counterclaim it is alleged that Crane at the time of his death was indebted to the John B. McMillan estate in the sum of more than $4,500; that after Crane's death and before the appointment of an administrator of his estate, the heirs of the McMillan estate threatened to enforce payment of such indebtedness; that with the knowledge of Crane's widow, and at her request, Merriman, to protect the interests and conserve the assets of the Crane estate, agreed to pay the McMillan estate the sum of $4,500 in full settlement of its claim against the Crane estate, but that before the consummation, Merriman died; that negotiations for settlement were taken up by the defendant, and that the defendant paid $4,500 to the heirs of John B. McMillan pursuant to the written authority of Crane's widow "wherein and whereby * * * she promised and agreed that the repayment thereof to this defendant should be collaterally secured by 2528 shares of the capital stock of the Chief Consolidated Mining Company." It is alleged that the $4,500 payment was necessary to protect the interest of the Crane estate and that it effected a substantial saving to he estate, "and that by reason of said payment this defendant has

become and is the equitable assignee of" the claim which the heirs of the McMillan estate had against the Crane estate, "and this defendant is accordingly subrogated to all of the rights and interests and remedies" which were available to the McMillan heirs or that might now be available to them were the claim yet unpaid.

It is also alleged that in due time defendant presented to the plaintiff a duly verified claim against the Crane estate for $4,500 with interest, and that on July 13, 1927, the same was refused and disallowed.

In his reply to the counterclaims of the defendant, the plaintiff admits that the defendant presented the various claims and that the same were denied; denies that deceased was indebted to Merriman in the sum of $2,020.45 or any other sum; denies that deceased was indebted to the McMillan heirs in the sum of $4,500 or any other sum; and alleges that the claims set forth in the first and third counterclaims, if any ever existed, are barred by the provisions of Comp. Laws Utah 1917, §§ 6464, 6466, subd. 2, and section 6467.

During the time the case was pending in the district court, various stipulations were entered into between the parties for the purpose of selling the stock upon a favorable market. Eleven hundred shares of the certificate of stock held by Norman as collateral security were sold and his note, with interest, was paid and taken up and a new certificate for 21,328 shares was issued in the name of Walker Bros., Bankers, and finally the balance of the stock was sold and converted into money and the money deposited with the bank pending the outcome of this litigation.

The case was tried to the court, who, on the first counterclaim, found that Lewis Merriman did not make a loan of $2,020.45, or of any other amount, to Crane, and that Crane did not cause the stock to be issued to Merriman as security for the payment of a loan of any kind, and that Merriman had no claim to or lien on said stock or any part thereof.

The court found, on the second counterclaim, that the

employment of counsel to negotiate a settlement of a claim made by J. B. McMillan was without authority and the money paid for such services, if any, by Merriman, is not chargeable against the estate of Elias W. Crane, deceased.

The court found on the third counterclaim that Elias W. Crane, deceased, was not indebted to the estate of J. B. McMillan in the sum of $4,500, or any other sum whatsoever; that his widow had no authority to bind the estate by consenting to a payment of a claim against it; that she had no authority to create a lien upon the stock of Elias W. Crane held by Lewis Merriman, deceased, during his lifetime; that there was no lien on said stock created in favor of the defendant by its payment of $4,500 to the heirs of the McMillan estate; that the defendant is not an equitable assignee of any claim of the heirs of the McMillan estate against the estate of Elias W. Crane, deceased; and that the defendant is not subrogated to the rights or remedies that would be available to said heirs had the defendant not paid the alleged indebtedness.

Decree was entered in favor of the plaintiff and against the defendant, from which the defendant has appealed.

The defendant, by its assignments of error, has raised the question of the sufficiency of the evidence to justify the findings of fact, conclusions of law, and decree.

In support of its first counterclaim the defendant introduced in evidence a paper containing a list of the items set out in the counterclaim. Over the top of the figures were written the words, "Loans to Elias W. Crane." Mrs. Mellor, a witness for the defendant, testified that some time during the summer of 1925 she and Merriman were in the course of assembling items from various canceled checks and stubs from old check books and other memoranda when Mr. Crane came in; that he saw the paper and picked it up, and in a conversation with Merriman said, "The figures are all right to here"; that the figures indicated appeared above the total of $2,020.45. The witness testified that her part of the work

consisted of searching among old checks and check stubs of Merriman's, and that Merriman wrote the items down on the paper that represented loans. There is evidence that the contents of the paper was in Merriman's handwriting. The witness then identified ten checks and a number of old check books containing stubs from which most of the items were taken. These were received in evidence. There is also a vague statement by the witness Norman in the nature of a conclusion that during a conversation in which the witness, Crane, and Merriman took part, he "got the information that Crane owed Merriman some money * * * around a couple of thousand dollars." This constitutes all the evidence on the part of the defendant in support of its first counterclaim. The first item in the counterclaim is shown by a check for $1,000 dated August 8, 1921, from Merriman to Crane. Crane, at the time, was being keenly pressed by McMillan for payment of his indebtedness to him. Merriman had promised to help Crane obtain some money. The plaintiff explains this check as being made by Merriman in anticipation of a loan to be made from Norman to Crane the following day. The next day, August 9, 1921, Merriman and Crane gave their note for $1,000 secured by 10,000 shares of the Apex Mining Company stock to Norman. The following day, August 10, 1921, Merriman deposited with the Eureka Banking Company $1,000, and on that same day Crane deposited with the First State Bank of Salina the check he had obtained from Merriman two days before. This amount was immediately withdrawn by Crane and paid to McMillan. This, in our judgment represents the true situation with reference to this particular transaction. It at least affords a satisfactory explanation of why Merriman did not take from Crane a note or other evidence to indicate that this was a loan, and why, if Crane received the $1,000 from Norman on August 9th in addition to the $1,000 from Merriman on August 8th, the record in the case fails to disclose the slightest trace of what he did with the money. His bank statement shows only the deposit of the Merriman

check, and although being hard pressed by McMillan for money, he made but the $1,000 payment to him at that time. Were further confirmation necessary that this is the correct situation, it may be shown that Crane anticipated that the $1,000 was to be obtained in the manner indicated by the two letters written by him to McMillan a few days before he received the $1,000. In a letter dated July 25, 1921, he wrote:

"I have * * * postponed writing you until I could get some line upon the money. Mr. Merriman has promised to help me get it. * * * In order to get it I will have to have my stock to give in security. Mr. Merriman thinks he can get $1,000.00 right away. * * * "

In another letter, dated August 1, 1921, he wrote:

"Stock certificates came O. K. Mr. Merriman has been real busy with the shaft at the Apex and hasn't been able to work on getting the money. He will have more liberty now. * * * "

That it was not his own money that Merriman was to let Crane have is indicated by the following excerpt from the same letter:

"He [Merriman] will have some money of his own soon and will let us have that."

In our judgment the record conclusively shows that the check from Merriman to Crane·was not a loan at all, but was given to Crane in anticipation of getting the loan from Norman the following day from which Merriman would reimburse himself.

There are thirteen additional separate items upon which the first counterclaim is founded. We have carefully examined all of the evidence submitted relative to each of them. To state the substance or even our conclusions relative to each separate item would extend this opinion to undue length and would serve no useful purpose. Barring the $500 item, most of them are fairly well explained by the records presented in the case, and in such instances the record, fragmentary as it is, conclusively shows that the amounts

charged in the first counterclaim as loans were paid to Crane for personal services rendered by him or money advanced by him during the month and on pay day deducted from his pay check, or, as in the eighth item, for personal expenses incurred by him. So conclusively is this established by the record that it completely discredits the correctness of the figures shown on Exhibit 2, which is the paper containing the figures which the witness Meller said she and Merriman had compiled and upon which the defendant's first counterclaim is based. In other items there is a variance in the amount of the check and the amount charged, and also in the date of the check and the date when it was charged.

With reference to the $500 item, the defendant offered a check dated October 29, 1921, for $500. The stub of this check is not in evidence. Upon Exhibit 2 a charge is made as of October 21, 1921. A charge in the exact amount was made against Mrs. Crane on October 30, 1921. No explanation is made of the variance of the date of the check and the date it is charged. Except for Exhibit 2 and the statement of the witness Meller with reference to Crane's presence and his approval of the figures on the exhibit, there is not a word or a line of evidence that the check was given as a loan. Manifestly, without this statement of the witness Exhibit 2 would not have been competent evidence. The correctness of the figures on the exhibit having been so completely discredited by the other evidence in the case in so many particulars, the exhibit and the statement of the witness were entitled to but little or no weight. Without the exhibit, and in the absence of the statement of the witness, there is no evidence in the record at all to characterize a single item as being a loan. The witness is directly interested in the Merriman estate. She claims that she is the beneficiary under a contract between herself and Merriman by the terms of which Merriman agreed to make her his sole legatee under a will, which he failed to do. She now has an action pending to recover the estate.

Merriman and Crane were two of the three original locators of the Apex mine. They were, and had been up to the time of Crane's death, closely associated in mining. Not only was Crane employed by Merriman, but they were jointly interested in working leased properties. When they received the returns from ore shipped by them, Merriman frequently divided the proceeds by paying the others their proportion with his own checks.

In 1 Abbott's Trial Evidence (3d Ed.) pp. 654, 655, the following language appears:

"Proof of the delivery by plaintiff of money or checks to the defendant is not enough without something to characterize the act as a loan. Delivery of money is presumed, in the absence of other evidence, to be in payment of an obligation."

In *Morrow* v. *Frankish*, 4 Boyce (27 Del.) 534, 89 A. 740, the court said:

"A check is not prima facie evidence of a loan."

See, also, *Nay* v. *Curley*, 113 N. Y. 575, 21 N. E. 698.

Check stubs are generally held inadmissible to show cash transactions of indebtedness. 22 C. J. 871, § 1047.

The manner in which the stock was handled by Crane also indicates there was no stock given to Merriman as security. If there were an indebtedness at all, it was contracted before November 4, 1924, except as to the last item of $40. Nowhere does the record show that Merriman held any of the Apex stock belonging to Crane as security or otherwise, although the major portion of the indebtedness, if any, had been contracted since 1921. It is not claimed that Merriman had any of the stock in his possession before the consolidation of the Apex with the Chief Consolidated Mining Company, and from what is shown in the record, at the time of the consolidation Norman was holding all the Apex stock as security. In our judgment, Merriman's connection with the Chief Consolidated stock is explained in a statement or

admission made by him to Norman. Merriman stated to Norman that he had taken the stock in his name because Crane was afraid that McMillan would jeopardize his estate in case of his death and that Crane believed that in the event of his death more could be realized out of the stock by making the transfer of it over to Merriman. Just when the transfer was made is not clear, but according to Norman, it was in 1925, either at the time of the consolidation of the mining companies or soon thereafter. This, in our opinion, represents the only interest Merriman had in the stock or any part thereof. Crane was not indebted to Merriman and the title of the stock was not transferred to Merriman for security, but the transfer was made without consideration and in fraud of the McMillan heirs.

The evidence, we think, is ample and sufficient to sustain the findings of the trial court upon all the issues joined on the first counterclaim.

If Merriman had no lien upon the stock, it must follow that the plaintiff's plea of the statute of limitations as to the first three items contained in the counterclaim must also be sustained.

The indebtedness, if any, created by the check dated October 29, 1921, from Merriman to Crane for the sum of $500, and the one dated August 8, 1921, for $1,000, Crane having died December 19, 1925, is barred by Comp. Laws Utah, §§ 6464-6467. The defendant's application of the dividends received from the stock which came into his possession after it was appointed administrator of Merriman's estate upon the first three items of the counterclaim, was without authority and neither tolled the statute nor removed the bar.

The defendant must fail upon its second counterclaim. The defendant's intestate may have employed the firm of attorneys at the request of Mrs. Crane; and the services were undoubetedly rendered as alleged. But such employment, in so far as it is sought to bind the estate of Elias W. Crane, deceased, was wholly with-

out authority. *Dunn* v. *Wallingford,* 47 Utah 491, 155 P. 347.

By plaintiff's reply to defendant's third counterclaim two questions are presented: (1) Was the estate of Elias W. Crane, deceased, indebted to the McMillan heirs in the sum of $4,500 or more? (2) By paying said heirs the sum of $4,500 in full satisfaction of such claim and demand, if any, was the defendant in a position where it might invoke the equitable doctrine of subrogation so as to be substituted to the legal rights of the McMillan heirs in reference to the claim paid by it?

In reference to the first proposition, the record contains an unqualified admission or statement in a letter written by Crane to McMillan dated December 10, 1920, to the effect that Crane then owed McMillan $8,200. Included in this amount is a note for $3,000 dated November 1, 1919, payable November 1, 1920, with interest at 8 per centum per annum. It is the contention of the plaintiff that this note constitutes all of the indebtedness of Crane to McMillan, and that it was paid before Crane's death and surrendered to him, and that if there were any additional indebtedness it was not evidenced by notes or writings and is therefore barred by the statute of limitations.

The record discloses that the $3,000 indebtedness evidenced by the note had a separate and distinct identity even before the note was given. In a letter dated October 13, 1919, Crane wrote to McMillan of the "$3,000.00 due you this month" and expressed a desire to retain this amount for another year. The letter further reads: "If you would agree to loan us the $3,000.00 at 8 per centum from the time it is due this month for one year we can furnish you good security in Apex Standard or North Standard." A note was executed and sent to McMillan November 13, 1919. There is no evidence that any stock was sent to him as security for the note at that time, and the record does not disclose just when McMillan did get the stock. But it is certain

that he had received the stock long before the note came into existence. A little more than a month after the maturity of the note, Crane, in the letter to McMillan telling of his efforts to secure money with which to pay him, said: "If Mr. Crandall will give me thirty days I will be able to sell enough to pay you the $8,200.00 I owe you and clear everything up." That the note was not paid at maturity, and that Crane kept a separate account of the note from the other indebtedness, is shown by Defendant's Exhibit 46. With the exception of the caption and the last two lines, Exhibit 46 refers solely to the promissory note. The whole exhibit is shown to be in Crane's handwriting. The caption is: "Liabilities to J. M. McMillan estate." The first line is: "1919 to 1920 paid the interest $240.00." This conclusively shows that the interest on the note for the first year was paid. The next line shows that $600 was paid on the principal "as by Mr. Jensen's statement." Jensen's statement is not found in the record, but by application of $600 the principal is reduced from $3,000 to $2,400. It is shown that there were further payments made on this note of $1,000 on August 1, 1921, and $500 on November 1, 1921, applied as of the respective dates thereof. The computation of the interest, which takes into consideration these payments, the consequent deductions and charges, and in fact every entry on that portion of the exhibit, are unmistakable proof that they have reference solely to the note. It may be noted at this time that from the figures as they appear on the exhibit the interest for the year ending November 1, 1921, has been paid twice. The result of the figures and computations on the exhibit is the balance of $1,412.25, immediately following which are the words: "Amount due M. estate on above transaction." As computed there would have been due and owing from Crane to McMillan on the note transaction the sum of $1,412.25 as of November 1, 1923. But allowing for the excess interest there is a balance of $1,149.87.

There is much uncertainty in the remaining two lines of the exhibit which reads: "Interest on $5,000.00 for 3½

years=\$1,528.84," and "Amount due McMillan \$5,208.84." The figures \$5,000 in the formula were written over other figures which the experts who testified as to the handwriting of the exhibit said were "\$2,400.00" or "\$2.500.00." Notwithstanding this uncertainty and its incompleteness, that portion of the exhibit is important for the reason that it is evident that it refers to Crane's indebtedness other than that represented by the promissory note. In the caption Crane employs the plural expression "liabilities," and at the conclusion of the figures having reference solely to the note he designates the balance as the amount due on the above "transaction," denoting but a single matter. In the first line of the above formula the rate of interest is not given, but, if we assume it is 8 per cent, the same rate which the note bears, \$1,528.84 represents interest for $3\frac{1}{2}$ years on the sum of \$5,460. If we deduct \$3,000, the amount of the note, from \$8,200, the amount Crane admitted he owed McMillan on December 10, 1920, we have \$5,200, which is \$260 less than the requisite amount to make the first formula arithmetically correct. How the balance of \$5,208.84, which is characterized by the exhibit as the "amount due McMillan," was obtained, is not shown in the formula. But it is obvious that to secure a balance of \$5,208.84 from an amount where the interest alone for $3\frac{1}{2}$ years is \$1,528.84 would indicate that a large payment had been made or an equally large credit had been given. Just when the entries which make up Exhibit 46 were made is not definitely fixed by any evidence in the case. It being on a single sheet of paper, it seems most probable to have all been made out at one and the same time. As the interest on the note is computed to November 1 1923, and added to the principal, as shown on the exhibit, it is evident that it was not made until after that date.

Except for the \$500 alleged to have been paid to the McMillan heirs in January of 1925, of which there is no evidence either that Crane received any money at that time or that he paid it to the McMillan heirs, the only payment made

by Crane after November 1, 1923, to the McMillan heirs is the $1,000 which was paid July 10, 1924. This money Crane borrowed from Norman. The fact that interest was computed for 3½ years shows that this entry or formula on the exhibit has no reference to the promissory note, and it also connects up, in point of time, with the payment of this $1,000. This is just one month more than 3½ years after December 10, 1920, when Crane made the statement that he was owing $8,200 to McMillan. As shown by this exhibit, Crane's method, on making a payment, was to compute the interest due on the account and to ascertain the amount he added the interest to the principal from which he deducted the payment. Crane's entire obligation was an interest-bearing debt. The reference, therefore, in the formula under consideration, to 3½ years for which interest was computed, justifies the inference that interest had been paid or otherwise satisfactorily disposed of up to the time when the 3½ years began. We may therefore infer that soon after December 10, 1920, Crane made some payment or made some adjustment of the interest on this account. Under the situation here presented, it also definitely fixes the account to which this $1,000 was applied by Crane. It is admitted by all concerned that the $1,000 was paid to the McMillan heirs, and, except for the statute of limitations, it is immaterial as to where it was applied. There is no evidence that any express direction was made by Crane as to its application. In the absence of any agreement or direction as to its application, it, as a matter of law, under the circumstances of this case, should be applied in extinguishment of the claim which is earliest in time. 21 R. C. L. 103, § 109.

After the payment, in July, 1924, of the $1,000 the record shows that Crane was indebted to the McMillan heirs on the note in the sum of $1,149.87, and on the other account in the sum of $5,208 at least, or a total of $6,357.87.

With the view of proving an additional payment of $500 in January, 1925, it was shown that Crane and Merriman

signed a promissory note for $500 payable to Norman dated January 6, 1925. The record is absolutely silent as to any money having been received by Mr. Crane on said note. And it is not shown by the record that any money whatsoever, at or near the date of the note, was paid to the McMillan heirs. Assuming that the plaintiff would be entitled to a credit for this $500, there was no direction as to where it should be applied, and, under the rule just stated, a court would apply it in extinguishment of the claim which is earliest in time. That would be upon the indebtedness not represented by the promissory note. The portion of Exhibit 46 having reference to the promissory note, as has been stated, is full and complete as to all payments and interest accumulations. Yet it is significantly silent as to the payment of $324.60 which the witness Sorensen testified was paid by Crane to McMillan in his presence on March 8, 1920, at Murray, to be applied on the promissory note; $24.60 of said amount being interest. Such an interest charge does not fit into any situation in the entire case. Exhibit 46 fully and completely discredits Sorensen's statement.

In connection with the plaintiff's contention that the note constituted the only liability of Crane to McMillan, it is important to consider that the note had been in existence for more than one year before Crane made the statement relative to the amount he was owing to McMillan on December 10, 1920. It is also important to keep in mind that McMillan died one year after the statement was made. It would therefore be necessary for Crane, during the year intervening between the time he made the statement as to the amount of his indebtedness and the time of McMillan's death, to have paid McMillan $5,200. There is nothing in the record to show any deal or transaction between Crane and McMillan whereby any portion of the indebetdness had been paid except as indicated on Exhibit 46. We think the record presented on this phase of the case as to whether Crane was indebted to the McMillan heirs will admit of no other conclusion than that Crane was indebted to the McMillan heirs

in a sum in excess of $4,500, and in this amount there is an unpaid balance on the promissory note of $1,147.87. We are not required, in this case, to determine just the exact amount of the indebtedness due from Crane to the McMillan heirs further than to determine that Crane was indebted to them in a sum equal to or in excess of $4,500.

The remaining question to be considered is the right of defendant, under the circumstances of this case, to be subrogated to the rights and remedies of the McMillan heirs in reference to the debt which was paid by the defendant. The facts bearing on this subject are as follows: The debt due the McMillan heirs was unsecured. Norman held, by indorsement from Merriman one certificate for 3,428 shares of stock as security for the payment of three promissory notes in the aggregate sum of $4,500 which is the amount Norman loaned to Crane. Merriman signed the notes with Crane as an accommodation to him, and also held two certificates of stock for 100 shares each. As before stated, Merriman was not holding any of the stock as collateral security. Crane was not indebted to him, nor was the stock placed in his name on the books of the mining company for the purpose of giving him a lien or other security in the stock. Crane transferred the stock to Norman without consideration and in fraud of the McMillan heirs. Subject to the security of Norman, McMillan held the stock in trust for the estate of Elias W. Crane, deceased. Before an administrator of the Crane estate had been appointed, the McMillan heirs made demand upon Mrs. Crane and Merriman for the payment of the indebtedness to them from Crane. Mr. Merriman sought counsel from able attorneys and was advised that Crane's estate ought to be probated. As the stock in question comprised the whole estate, Merriman did not want to incur the expenses of administration. Upon recommendation of his attorneys, Merriman offered to pay, by way of compromise and settlement, the sum of $4,500 in full satisfaction and discharge of the entire indebtedness to the McMillan heirs. This offer was accepted,

and Merriman gave his attorney a check for the amount to be handed to the McMillan heirs upon their procuring a satisfactory release and a certified copy of the decree of the court authorizing the compromise on behalf of the minor heirs. During the time these papers were being made out, Merriman died and defendant was appointed administrator of his estate. Just after the appointment of the defendant as administrator of the Merriman estate, negotiations for settlement with the McMillan heirs were resumed. After a number of conversations with Mrs. Crane, the attorneys for the Merriman estate sent her a letter dated August 12, 1926, outlining a plan for the payment of the indebtedness by the defendant. This letter proposed that the Norman notes for $2,500 with accrued interest, the alleged debt to Merriman of $2,020.45, and a loan made by Merriman to Mrs. Crane in the sum of $2,775 and the sum of $4,500 due the McMillan heirs, were to be paid out of the Chief Consolidated stock. The letter concludes as follows:

"Further delay in closing the McMillan settlement should be avoided, and we are anxious to do so, and as a necessary preliminary to that transaction there should be a definite and thorough understanding between the Merriman estate and you about all the elements which pertain to the whole transaction. As intimated in our former letter, when we were not in possession of all the facts, we would like your assent to the correctness of the matters herein related, and written authority from you to make this Crane settlement, to continue to hold the Chief Consolidated stock as security for all of the above mentioned debts and obligations, to pay off the Norman notes and to dispose of the Chief Consolidated stock from time to time, with the obligation upon the estate's part to account for and pay over to you any balance which may remain after fully discharging all of these debts and obligations.

"May we ask, therefore, that if this meets with your approval you endorse your written acceptance on this letter and return it to us. A duplicate is enclosed for you to retain."

The letter and its approval by Mrs. Crane was introduced in evidence and is referred to in the record as Exhibit 6.

Soon after receiving Mrs. Crane's approval of the foregoing plan of settlement set out in the letter, defendant paid

$4,500 to the McMillan heirs, and a release in full was signed by the heirs forever discharging the Crane estate, its heirs and personal representatives, from any further liability by reason of such indebtedness.

When a third person pays the debts of another, it always requires something more than the payment of the debt in order to entitle such person to be substituted in ■ the place of the original creditors. *Crippen* v. *Chappel,* 35 Kan. 495, 11 P. 453, 57 Am. Rep. 187.

Subrogation is a remedy highly favored in equity. It seems to have first been applied in favor of sureties, but has been greatly extended. The most general application of the principle occurs in cases where the person advancing money to pay the debt of a third party stands in the ■ situation of a surety or is compelled to pay the debt to protect his own rights. 25 R. C. L. 1316, 1317, § 5; *Dunlop* v. *James,* 174 N. Y. 411, 67 N. E. 60. The rule as to when the doctrine of subrogation is applied is stated by the New York Court of Appeals in *Gerseta Corp.* v. *Equitable Trust Co.,* 241 N. Y. 418, 150 N. E. 501, 504, 43 A. L. R. 1320, as follows:

"Subrogation, an equitable doctrine taken from the civil law, is broad enough to include every instance in which one party pays a debt for which another is primarily answerable, and which in equity and good conscience should have been discharged by the latter, so long as the payment was made either under compulsion or for the protection of some interest of the party making the payment, and in discharge of an existing liability. Seldom on Subrogation (2d Ed.) pp. 2, 4."

In other decisions it has been held that if the person paying stands in such a relation to the premises that his interest, whether legal or equitable, cannot otherwise be adequately protected, the transaction will be treated in equity as an assignment. *Arnold* v. *Green,* 116 N. Y. 566, 23 N. E. 1; *Pittsburgh-Westmoreland Coal Co.* v. *Kerr,* 220 N. Y. 137, 115 N. E. 465.

Where the person who pays the debt of another stands in the situation of a surety or is compelled to pay to protect his own right or property, the right of subrogation is a consequence which equity attaches to such a condition, and the right of subrogation under such circumstances is not the direct result of an agreement. This, in law, is termed "legal subrogation." In addition to the principle of legal subrogation, there exists another principle termed "conventional subrogation," which occurs where the one who is under no obligation to make the payment, and who has no right or interest to protect, pays the debt of another under an agreement, express or implied, that he will be subrogated to rights of the original creditor, made with either the debtor or creditor. 25 R. C. L. 1316, 1317, subd. 3, also pages 1337-1342; *Home Savings Bank* v. *Bierstadt*, 168 Ill. 618, 48 N. E. 161, 61 Am. St. Rep. 146; *Wilkins* v. *Gibson*, 113 Ga. 31, 38 S. E. 374, 84 Am. St. Rep. 204; *Crippen* v. *Chappel*, Supra; *Capen* v. *Garrison*, 193 Mo. 335, 92 S. W. 368, 5 L. R. A. (N. S.) 838. Do the facts in the instant case bring the defendant or its intestate within the principle upon which the doctrine of equitable assignment by subrogation, either legal or conventional, rests?

First, as to legal subrogation: Counsel for defendant has given this phase of the case but little consideration in their brief. The question is not mentioned by them except for the following statement:

"Irrespective of the widow and of anything she said or did, Merriman had in his own right, as creditor of Crane, as a joint maker with Crane of the Norman notes, and as a holder of the legal title to the Chief Consolidated Mining Company stock as security for Crane's indebtedness to him, such an interest as * * * authorized his * * * paying off the McMillan debt."

As we have already stated, the evidence does not support the conclusion that Merriman was a creditor of Crane, or that he was holding any of Crane's mining stock as security. But assuming that such were the condition, that fact would

not place Merriman, a secured creditor, in a situation where he would be under the necessity of paying the unsecured claim of the McMillan heirs to protect his own interest. The fact that Merriman signed the Norman notes as a joint maker with Crane did not place him in a situation with reference to the indebtedness due to the McMillan heirs where he was under compulsion or the necessity of self-protection to pay such demand. Norman was not demanding payment of his notes. His security was admittedly superior to any possible right or claim which was or could have been available to the McMillan heirs. The fact that the mining stock was standing on the books of the mining company in Merriman's name, and that he still had in his possession 200 shares of the stock, imposed no legal or moral duty, nor conferred any right or authority upon Merriman or his administrator, to pay the unsecured claim of the McMillan heirs against Elias W. Crane, deceased. The condition under which the stock was placed in Merriman's name imposed upon him the duty to transfer whatever stock he had in his possession to the administrator of the estate of Elias W. Crane, deceased, as soon as one was appointed, upon demand being made therefor, and to relinquish to such administrator all title to the stock not in his possession which belonged to the estate. The McMillan heirs had no lien on the stock. The threatened enforcement of their claim against the estate of Elias W. Crane, deceased, could have resulted only in the appointment of an administrator of the decedent's estate and payment of their claim in due course of administration of the estate, and such a proceeding is favored in law and ought to have been instituted by Mrs. Crane, or, upon her failure so to do, such a proceeding might have been instituted by Merriman, not only for his own protection, but to safeguard the rights of the widow and minor children. Clearly, the defendant was under no obligation, either by compulsion or self-protection, to pay the $4,500; and certainly for its own protection it could have taken an assignment from the McMillan heirs. It is clearly the policy

and intent of the statutes of this state, relative thereto, that the estates of deceased persons should be subject to the process of administration in the probate court for the purpose of collecting the property of the decedent and ascertaining and protecting the rights of creditors and heirs. 23 C. J. p. 998, § 10. It was said in *Kessler* v. *Stewart*, 64 Cal. App. 268, 222 P. 145, that settlement of a decedent's affairs without the aid of the courts is not favored by the law.

It cannot be said that when it paid the $4,500 to the McMillan heirs defendant stood in such a relation to the mining stock that its interests, or the interests of its intestate, could not have been adequately protected except by paying the demand of the McMillan heirs. "To entitle one to subrogation his equity must be strong and his case clear." 25 R. C. L. p. 1315, § 4. It is a familiar principle in the application of this remedy that "equity will relieve, in general, only those who could not well have relieved themselves." 5 Pomeroy, Eq. Jur. (4th Ed.) § 2344. Except for the payment of the debt, we see no equity in favor of the defendant. In fact, none was pleaded by it, and none was shown in the evidence.

"The doctrine of subrogation is not applied for the mere stranger or volunteer, who has paid the debt of another, without any assignment or agreement for subrogation, being under no legal obligation to make the payment, and not being compelled to do so for the preservation of any rights or property of his own." Sheldon, Sub. § 240; *Wilkins* v. *Gibson,* supra.

A stranger or "volunteer," within the meaning of this rule is one who in no event resulting from the existing state of affairs can become liable for the debt and whose property is not charged with the payment thereof and cannot be sold therefor. 25 R. C. L. pp. 1324, 1325, § 11; *Hoffman* v. *Habighorst,* 49 Or. 379, 89 P. 952, 91 P. 20; *Wilson* v. *Smith,* 213 Ky. 836, 281 S. W. 1008, page 1010.

Second, as to conventional subrogation: Conventional subrogation depends upon a lawful contract. The defendant

relies upon Mrs. Crane's written approval and acceptance of the defendant's proposed plan of settlement contained in the letter above mentioned, which is referred to in the evidence as Exhibit 6.

Inasmuch as the defendant was under no obligation to make the payment and had no right or interest to protect, in order that it may be entitled to the right of subrogation, under the authorities cited, it is incumbent upon it to show that it had an agreement with the debtor or creditor, express or implied, to the effect that upon payment it would be subrogated to the rights of the McMillan heirs. It requires no argument to show that Mrs. Crane's approval and acceptance of the defendant's proposal, in so far as it attempted to bind the estate of Elias W. Crane, deceased, is void. She had no authority to act in behalf of the estate, and her assent to the correctness of the statement contained in the proposal, as well as her attempt to confer authority upon the defendant to make the settlement with the McMillan heirs and to reimburse itself from the proceeds derived from the sale of the stock, can have no binding effect as against the estate of Elias W. Crane, deceased. *Dunn* v. *Wallingford*, 47 Utah 491, 155 P. 347. The agreement does not purport to assign or in any way bind merely Mrs. Crane's distributive share of the estate. Whatever may be its effect in that connection is not before us, and we do not attempt to say.

The defendant undoubtedly recognizes that the argeement is invalid, otherwise it would seek to enforce the contract directly and not be here asking the aid of equity to substitute it to the claim of the McMillan heirs. It must follow that as Mrs. Crane had no authority to act in behalf of the estate, her agreement or invitation to the defendant to pay the debt did not relieve defendant of its character as a stranger and volunteer at least as against the estate of the plaintiff. In this connection the defendant makes no claim that there was any equitable features, such as a mistake of fact, or fraud, or misrepresentation, present or involved in relation

to the agreement or the payment of the money by reason of such agreement. Therefore, in so far as the agreement with Mrs. Crane was the inducement for the defendant to make the payment, it raises no equity whatever in favor of defendant. It but establishes the fact that the defendant paid out its money in the light of all the facts and that it was in a position where it might elect whether it would do so or not. Therefore it is not entitled to be subrogated. Sheldon, Sub. § 240.

It is further urged by defendant that as Mrs. Crane might have paid off the same indebtedness with her own money, and thereby have been entitled to be subrogated to the rights of the McMillan heirs as against creditors of the deceased, or in suit for contribution as against her coheirs (*Columbia Trust Co.* v. *Anglum,* 63 Utah 353 225 P. 1089; *Merrill* v. *Comstock,* 154 Wis. 434, 143 N. W. 313; *Brown* v. *Orr,* 110 Va. 1, 65 S. E. 499, 135 Am. St. Rep. 912; *Brown* v. *Forst,* 95 Ind. 248), so the defendant, by paying the obligation upon her invitation, may not be regarded as a mere volunteer. This contention is not sound. The widow's right of subrogation arises by force of law because of her interest in the property of the estate and because of the necessity of self-protection. The defendant came into the transaction on its own volition by reason of its contract with Mrs. Crane. Its right to subrogation is controlled by its contract. Inasmuch as Mrs. Crane had no authority to speak for the estate of her deceased husband, her invitation to the defendant to pay the $4,500 to the McMillan heirs did not warrant or justify the defendant in so doing.

As we view the record, there is no equity in favor of the defendant either by reason of this contract with Mrs. Crane or by reason of any relation of the defendant or its intestate to the mining stock which would entitle the defendant to a decree of subrogation to the rights of the McMillan heirs. To grant such a decree under the facts in this case would be to do so solely on the ground that defendant had voluntarily paid an indebtedness to the McMillan heirs which was due

and owing by Elias W. Crane, deceased. As we have seen, that alone is not sufficient. It always requires something more than payment of the debt in order to entitle the person paying to be substituted in place of the original creditor.

Other questions are raised on this appeal. Because of the conclusion we have arrived at, it becomes unnecessary to discuss them herein.

The finding of the trial court on the third counterclaim, to the effect that Elias W. Crane, deceased was not indebted to the McMillan heirs in the sum of $4,500, or in any other sum or at all, at the time of his death, is disapproved. The case is remanded to the district court of Salt Lake county, with directions to strike such finding and make and insert in lieu thereof a finding to the effect that at the time of his death Elias W. Crane, deceased, was indebted to the McMillan heirs in the sum of at least $4,500. In all other respects the findings and conclusions of the trial court are approved.

JUDGMENT AFFIRMED. Respondent is awarded his costs.

CHERRY, C. J. and STRAUP, ELIAS HANSEN, and FOLLAND, JJ., concur.