**2013 UT App 50**

# THE UTAH COURT OF APPEALS

FIRST NATIONAL BANK OF LAYTON,

*Plaintiff and Appellee,*

*v.*

RAY WM. PALMER,

*Defendant and Appellant.*

Opinion
No. 20110338-CA
Filed February 28, 2013

Seventh District, Monticello Department
The Honorable Lyle R. Anderson
No. 090700136

Craig C. Halls, Attorney for Appellant
Matthew C. Barneck and Wayne Z. Bennett, Attorneys for
Appellee

JUDGE GREGORY K. ORME authored this Opinion,
in which JUDGE WILLIAM A. THORNE JR.
and JUDGE J. FREDERIC VOROS JR. concurred.

ORME, Judge:

¶1 Ray Palmer and First National Bank of Layton dispute the priority of their competing lien interests in a parcel of commercial real estate. The district court certified this issue as final pursuant to rule 54(b) of the Utah Rules of Civil Procedure, and Palmer appeals the court's grant of First National's motion for partial summary judgment and simultaneous denial of his cross-motion for partial summary judgment. We reverse.

BACKGROUND

¶2      In July 2003, Palmer agreed to sell a parcel of commercial real estate to JDJ Holdings, Inc. for a purchase price of $1,950,000. JDJ paid $190,000 cash as a down payment and obtained two loans to finance the remainder of the purchase price. The first loan was from First National for $1,025,000 and was secured by a note and trust deed, with the deed being properly recorded on December 12, 2003. First National's loan was guaranteed by the United States Department of Agriculture (USDA) and a number of other individual guarantors.

¶3      JDJ obtained a second loan for $780,000 from Palmer as seller-funded financing, which was similarly secured by a note and trust deed. Palmer's trust deed was recorded immediately after First National's trust deed, placing it in second priority position. At the time of the transaction, First National was fully aware that Palmer was providing seller financing, and both parties intended and understood that First National's lien was to be in first priority position.

¶4      Just two months later, USDA informed First National that it had only agreed to guarantee $975,000 of First National's loan and that the recorded $1,025,000 trust deed needed to be broken down into two trust deeds—one for $975,000 and one for the remaining $50,000—to be consistent with that agreement.[1] Before reconveying the $1,025,000 deed, First National ordered an updated title report from the same title company that had previously recorded both First National's and Palmer's trust deeds. Unbeknownst to First National, the title company prepared an incorrect title report, which showed First National's trust deed as the only outstanding lien on the property even though Palmer's trust deed was properly

---

1. USDA agreed to guarantee only the money being loaned for use as purchase money. The other $50,000 was apparently to be used for business operations.

recorded. Despite its awareness that Palmer had provided financing to JDJ, First National did not take any additional action to inquire about the potential existence of Palmer's outstanding lien after receiving and reviewing the title report. Relying solely on the erroneous title report, First National reconveyed its trust deed on March 8, 2004, and immediately recorded a new trust deed reflecting the $975,000 guaranteed by USDA.

¶5     Nearly five years later, JDJ defaulted on the loans. Up to that point in time, neither party was aware that, because of First National's 2004 reconveyance, Palmer's trust deed had been elevated into and currently sat in first priority position. In May 2009, however, Palmer performed a title search of the property and discovered the change in priority. He subsequently informed First National of his discovery and stated his intention to begin foreclosure proceedings on the property.

¶6     In response, First National brought this action in July 2009 asking for, inter alia, equitable reinstatement and/or "subrogation" of its trust deed back into first priority position. First National and Palmer filed cross-motions for partial summary judgment, and in November 2010 the district court granted First National's motion, denied Palmer's, and reinstated First National's trust deed to first priority position. The district court reasoned that First National took sufficient care to discover any other outstanding liens and thereby "preserve[d] its entitlement to equitable reinstatement." Pursuant to the grant of partial summary judgment and the resulting reinstatement, First National initiated foreclosure proceedings and sold the property. Palmer now appeals.

## ISSUE AND STANDARD OF REVIEW

¶7     Palmer contends that there are disputed issues of material fact and that, in any event, First National was not entitled to judgment as a matter of law because First National reconveyed its trust deed in negligent disregard of Palmer's outstanding lien. He

maintains that despite its blind reliance on the erroneous title report, First National's failure to inquire further about the potential existence of Palmer's junior lien—especially given First National's knowledge of Palmer's seller financing—precludes equitable relief.[2] "Summary judgment is appropriate when there is no issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Dairyland Ins. v. State Farm Mut. Auto. Ins. Co.*, 882 P.2d 1143, 1144 (Utah 1994). On appeal, we "give[ ] no deference to the lower court's legal conclusions and review[ ] the issues presented under a correctness standard. Factual disputes are viewed in the light most favorable to the nonmoving party." *Emergency Physicians Integrated Care v. Salt Lake Cnty.*, 2007 UT 72, ¶ 8, 167 P.3d 1080 (internal citations omitted).


ANALYSIS

¶8      Palmer asserts that the district court's repositioning of First National's trust deed back into first priority position constituted an improper exercise of both equitable subrogation and equitable reinstatement. He argues that because it actually knew that Palmer had so recently provided seller financing, First National had an obligation to do more than simply rely on a title report that showed no other outstanding liens before reconveying its trust deed. In doing otherwise, Palmer insists, it did so at its peril. First National argues that the court's equitable powers are broad enough to put the parties back into the priority positions they intended, especially because First National reconveyed its trust deed based on a mistake of fact. Moreover, First National believes that allowing Palmer's lien to remain in first priority position will provide Palmer an

---

2. First National believes that this issue is moot in light of the completed foreclosure sale. We, however, are not persuaded and decline to dismiss this appeal on that basis. The parties are still before the court, and it appears that the rights of the parties can be adjusted as appropriate.

unexpected and undeserved windfall. Palmer replies that because any windfall to him is a result of First National's negligent failure to take reasonable steps to discover his trust deed, equity should not be too quick to come to First National's rescue.

## I. Equitable Subrogation

¶9    Palmer contends that the district court essentially subrogated First National's trust deed into first position, even though the court styled its remedy as a "reinstatement." We do not believe, however, that the doctrine of equitable subrogation has any application here and conclude that First National's trust deed cannot be returned to first priority position via this doctrine.

¶10    Although there is a relative dearth of subrogation case law in the context of real estate mortgages in Utah, our longstanding precedent recognizes two forms of equitable subrogation: legal subrogation and conventional subrogation. *See Martin v. Hickenlooper*, 59 P.2d 1139, 1141 (Utah 1936). Legal subrogation "arises 'where the person who pays the debt of another stands in the situation of a surety or is compelled to pay to protect his own right or property.'" *Id.* (quoting *Bingham v. Walker Bros., Bankers*, 283 P. 1055, 1063 (Utah 1929)). This form of subrogation is commonplace in insurance litigation, where an insurer will step into the shoes of its insured to bring an action against a tortfeasor. *See, e.g., State Farm Mut. Auto. Ins. Co. v. Northwestern Nat'l Ins. Co.*, 912 P.2d 983, 985 (Utah 1996) ("Utah law clearly recognizes an insurer's right to bring a subrogation action on behalf of its insured against a tortfeasor."). Legal subrogation is not applicable here because First National is not a surety and has not stepped into the shoes of another party. First National was not compelled to pay to protect its rights, and there are not, in fact, any shoes, other than its own, for First National to step into.

¶11    Conventional subrogation is also not an appropriate mechanism for placing First National's trust deed back into first priority position. Conventional subrogation "occurs where the one

who is under no obligation to make . . . payment, and who has no right or interest to protect, pays the debt of another under an agreement, express or implied, that he will be subrogated to [the] rights of the original creditor." *Bingham*, 283 P. at 1063. First National did not advance any money to pay off the original trust deed with the understanding or agreement that its new trust deed would be subrogated to first priority position. Instead, First National merely released its trust deed and subsequently recorded a new trust deed reflecting a different loan amount. No money changed hands and none of the already existing liens were paid off. By definition, First National's trust deed cannot move to first priority position on a theory of conventional subrogation because the money secured by the second trust deed was not used to pay off the released and reconveyed first trust deed. Because First National is not aiming to stand in the shoes of another and did not pay off a prior lien with the expectation of subrogating to the prior lien's priority position, we conclude that First National's trust deed is incapable of being elevated to first priority position through the doctrine of equitable subrogation. Thus, we decline to view the relief ordered by the district court as premised on a theory of subrogation and turn to consider the stated basis for the district court's disposition.

## II. Equitable Reinstatement

¶12    It is a well-accepted principle that when a mortgage is released by accident, mistake, or in ignorance of intervening lien rights, a court can equitably reinstate that mortgage to its original priority position. *See* 59 C.J.S. *Mortgages* §§ 323, 631 (2009); 55 Am. Jur. 2d *Mortgages* §§ 417, 1129 (2009); 2 Baxter Dunaway, *Law of Distressed Real Estate* § 26:41 (2010); *Badger Coal & Lumber Co. v. Olsen*, 167 P. 680, 682 (Utah 1917) ("When a new mortgage is substituted in ignorance of an intervening lien, the mortgage, released through mistake, may be restored in equity and given its original priority as a lien.") (citation and internal quotation marks omitted); *Home Fed. Sav. & Loan Ass'n v. Citizens Bank of Jonesboro*, 861 S.W.2d 321, 323 (Ark. Ct. App. 1993) ("[W]here a senior

mortgagee in good faith and without culpable negligence satisfied the lien of his mortgage on the record in ignorance of the existence of an intervening mortgage on the same premises and took a second mortgage as a substitute, equity will restore the lien of the first mortgage, provided it can be done without working hardship or injustice on innocent parties.").[3] Equitable reinstatement will be denied, however, if the party seeking reinstatement was negligent in failing to discover the lien that elevated to senior position. *See* 59 C.J.S. *Mortgages* § 323 ("A failure to exercise diligence and discover the existence of the record constitutes sufficient negligence to bar relief on the ground of mistake."); 55 Am. Jur. 2d *Mortgages* § 417 ("[I]n particular cases, the circumstances may be such as to justify the denial of the reinstatement of the mortgage because of the negligence of the mortgagee in connection with the release or discharge."). *See also Badger Coal*, 167 P. at 682 (observing that a party seeking equitable reinstatement did not substitute its

---

3. We are aware that section 7.3(a) of the Restatement (Third) of Property states,

> If a senior mortgage is released of record and, as part of the same transaction, is replaced with a new mortgage, the latter mortgage retains the same priority as its predecessor, except (1) to the extent that any change in the terms of the mortgage or the obligation it secures is materially prejudicial to the holder of a junior interest in the real estate, or (2) to the extent that one who is protected by the recording act acquires an interest in the real estate at a time that the senior mortgage is not of record.

Restatement (Third) of Property: Mortgages § 7.3(a) (1997). This particular section of the Restatement, however, was not raised below by either party, nor has it been briefed on appeal. Moreover, we are unaware of any decision that has specifically adopted section 7.3(a) as part of Utah's common law. Consequently, we decline to address the rationale of 7.3(a) or include it in our analysis.

mortgage in ignorance of an intervening lien because "[h]e could easily have ascertained just what the facts were . . . , but he did not take the trouble to ask [either of the intervening lienholders]"). Negligence in this context "is an omission of something that a prudent and honest person would do." 59 C.J.S. *Mortgages* § 323.

¶13    Given its possession of documents stating that a "second trust deed [was to be] held by the seller," we conclude that First National was at the very least on inquiry notice of Palmer's trust deed and was, consequently, negligent in failing to inquire about the potential existence of Palmer's outstanding lien after the title report did not disclose it. In determining whether a party is on inquiry notice, we first perform "a subjective inquiry to determine what actual knowledge" the subsequent party in interest had. *See Pioneer Builders Co. v. KDA Corp.*, 2012 UT 74, ¶ 26, 292 P.3d 672. We then "conduct an objective inquiry to determine whether those facts would lead a reasonable person to inquire further." *Id.*

¶14    It is a long-standing practice in the real estate industry for sellers to secure any financing they extend with a recorded trust deed against the property being sold, and the facts here would not prompt a reasonably prudent party in First National's position to conclude that Palmer planned to secure his loan any differently or, even less likely, to be content with an unsecured promise to pay. The record is replete with documents evidencing First National's awareness of the financing provided by Palmer. Most notably, the HUD settlement statement from the initial loan closing and the commercial credit summary, the latter of which was prepared on First National stationary, both clearly state that Palmer would provide $780,000 in seller financing. Simply put, First National had actual knowledge of Palmer's loan and, at a minimum, it should have known of the substantial likelihood that a trust deed securing that financing would be recorded.[4]

---

4. Palmer cites to twenty documents as evidence that First National had *actual* notice of Palmer's trust deed and not just the loan he

(continued...)

¶15     Under more typical circumstances, a lender's sole reliance on a title report might not be considered negligent. For example, a title report issued two decades later and showing no interest of record in favor of the seller would not be noteworthy. One would readily assume that the indebtedness secured by the seller's trust deed had been retired. But when a title report following so soon on the heels of the original transaction does not list a trust deed the lender would expect to see, the lender cannot simply turn a blind eye to what it knows, has reason to know, or has a duty to inquire about further. Accordingly, when the title report showed nothing but First National's $1,025,000 lien, it should have immediately piqued First National's attention and prompted further investigatory effort. A simple phone call to the real estate agent or to Palmer would have almost certainly revealed Palmer's outstanding lien, and it is likely that such a phone call would have averted this problem altogether. Instead, First National ignored what should have been an obvious problem and negligently failed to act. In our view, First National's decision to sweep its knowledge of Palmer's seller financing under the rug and proceed in blind reliance on what proved, not surprisingly, to be an erroneous title report was negligent and is the proximate cause of First National

---

4. (...continued)

extended. We do not see anything within those twenty documents to indicate that First National actually knew about the recordation of Palmer's trust deed. Of those documents, only three were generated after Palmer's trust deed was recorded. Two of the three are the erroneous title commitment and ensuing title policy. The third is a letter from USDA informing First National about the discrepancy in the first trust deed and the actual amount that USDA agreed to guaranty. That letter says nothing of Palmer's second trust deed. Regardless, though, of whether First National had actual notice of the recorded trust deed, many of the documents demonstrate that First National had ample reason to know of the likelihood that Palmer's loan would be secured by a trust deed recorded against the property.

losing its first lien position. Such negligence forecloses equitable reinstatement.

CONCLUSION

¶16     Equitable subrogation is not applicable to the circumstances of this case. First National was on inquiry notice, requiring it to go beyond the deficient title report and to investigate the potential existence of Palmer's lien. Because it negligently failed to do anything other than rely on the erroneous title report, First National is not entitled to equitable relief. We consequently reverse the district court's grant of partial summary judgment to First National and remand for further proceedings consistent with this opinion.

_____