GRIFFIN v. INTERNATIONAL TRUST CO.

(Circuit Court of Appeals, Ninth Circuit.    April 7, 1908.)

No. 1,494.

1. CORPORATIONS—MORTGAGES—TAKING NEW MORTGAGE FOR SAME DEBT—REINSTATEMENT OF ORIGINAL MORTGAGE.

A corporation executed a mortgage to a trustee to secure a $300,000 issue of bonds. After default in payment of such bonds, it executed a second mortgage to the same trustee to secure an issue of bonds of $500,000, which recited that it was subject only to the prior mortgage, and was given to secure the payment of the bonds given thereunder, which were to be paid by exchanging the same for bonds issued under the new mortgage, and that the holders of such bonds were willing to make the exchange. The first mortgage was not released of record. *Held*, that the provisions of the second mortgage preserved the lien of the first for the benefit of the holders of the bonds so exchanged, but, even if not, that a court of equity would reinstate it for their protection as against an attachment creditor who obtained a lien on the property before the second mortgage was executed, and which was not known to such bondholders or their trustee.

2. MORTGAGES—PRIORITY—RENEWAL.

The failure of a mortgagee of property in Alaska to ascertain the fact of an attachment lien thereon before taking a renewal mortgage, or to make the attachment creditor a party to the suit to foreclose the same, was not such laches as to debar it from the right to relief by a reinstatement of the original mortgage as against such lien, where no prejudice resulted to the holder thereof.

Appeal from the District Court of the United States for the First Division of the District of Alaska.

In Equity. Action to foreclose two certain mortgages on mining property in Alaska, the first mortgage executed December 15, 1891, and the second executed January 1, 1896; and to restrain a judgment creditor from proceeding with the sale of a part of the mortgaged property under the lien of an attachment levied after the first mortgage and prior to the second mortgage.

John G. Heid, William T. Love, R. F. Lewis, and Alfred Sutro, for appellant.

Shackleford & Lyons, John J. Boyce, and John A. Shackleford, for appellee.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge. This was an action brought by the International Trust Company, a corporation, against the American Gold Mining Company, a corporation, Frank W. Griffin, and James M. Shoup, United States marshal. The purpose of the action was: (1) To foreclose two certain mortgages, the first executed December 15, 1891, by the Nowell Gold Mining Company, the predecessor in interest of the American Gold Mining Company, to the International Trust Company, trustee, to secure the payment of 300 bonds of the par value of $1,000 each; the second mortgage executed January 1, 1896, by the Nowell Gold Mining Company to the International Trust Company, trustee, to secure the payment of 500 bonds of the par value of $1,000 each. (2) To enjoin and restrain the defendants James M. Shoup and Frank W. Griffin from proceeding with the sale of part of the mortgaged premises under a judgment entered in favor of Frank W. Griffin July 10, 1905, for $25,000 and interest, secured by the lien of an attachment levied November 24, 1893. The two mortgages are set forth in the bill of complaint. The first executed December 15, 1891, by the Nowell Gold Mining Company, was to secure the payment of 300 bonds of that date for the sum of $1,000 each, with interest at the rate of 7 per cent. per annum. It was provided that 60 of these bonds were to be paid on the 15th day of December of each year from the year 1893 to 1897, and, upon a default for one year on payment of either principal or interest on any of the same, then the whole principal should become due and payable at the option of a majority of the bonds then outstanding. It is alleged in the bill of complaint that none of the 300 bonds secured by the mortgage of December 15, 1891, were paid, and on the 1st day of January, 1896, the Nowell Gold Mining Company, for the purpose of providing for and retiring said $300,000 of bonds and interest thereon, and for the purpose of providing means to aid in the purchase of additional mines and mining properties in the district of Alaska, and of acquiring and constructing milling plants and mining equipments and for other corporate purposes, issued its bonds to the amount of $500,000, being 500 bonds of the par value of $1,000 each, bearing interest at the rate of 7 per cent. per annum. Thirty-five of these bonds were to be paid on the 1st day of January of each year, from the year 1901 to 1913, and the remaining 45 bonds were to be paid on the 1st day of January, 1914. It is alleged in the bill of complaint that of the 500 bonds of $1,000 each 298 were to be issued at the special instance and request of the Nowell Gold Mining Company and sold and delivered, and thereby the payment and retirement of 298 of the bonds of the issue of 300 bonds of the mortgage of December 15, 1891, accomplished and the bonds redeemed; that two of the bonds of the denomination of $1,000 each of the issue of December 15, 1891, were not so redeemed, but remained actually outstanding under and by virtue of the provisions of said mortgage; that the remaining 200 bonds of the issue of January 1, 1896, were executed and delivered, sold on the market, and the proceeds thereon were received by the Nowell Gold Mining Company; that at the same time, and as a part of the same transaction, the Nowell Gold Mining

Company made, executed, and delivered to the International Trust Company its mortgage and deed of trust dated January 1, 1896. In this mortgage it was provided that for the purpose of retiring the $300,000 of bonds of the Nowell Gold Mining Company dated December 15, 1891, with unpaid interest thereon, the holders of said bonds and interest being willing to exchange same for an equal amount of bonds of the issue of January 1, 1896, the Nowell Gold Mining Company should issue its bonds to the amount of $500,000, in denominations of $1,000 each, all dated January 1, 1896, and payable at the office of the International Trust Company of Boston, Mass., payment to be made of not less than 35 of said bonds on January 1st of each year from 1901 to 1913, both inclusive. It was also provided that said mortgage was subject only to the mortgage dated December 15, 1891, and given to secure the payment of said $300,000 of bonds of even date therewith, which were to be paid by exchanging the same for the issue of bonds of January 1, 1896.

It is alleged in the bill of complaint that in the year 1898 the Nowell Gold Mining Company amended its charter and legally obtained a change of its name to the American Gold Mining Company; that on December 11, 1902, the plaintiff caused foreclosure proceedings to be instituted for the foreclosure of the mortgage of December 15, 1891, with respect to two of the bonds of the issue of that date, and for the foreclosure of the mortgage of January 1, 1896, with respect to the 498 bonds of the issue of that date; that such proceedings were had in the matter that a decree was entered in favor of the plaintiff in the sum of $745,582, and the property covered by said mortgage was thereunder and thereby foreclosed and sold on the 31st day of March, 1903, and was at the sale bid in by the plaintiff for the sum of $382,000, and plaintiff believed in bidding in said premises it would leave the same free and clear of all incumbrances. The bill of complaint recites the commencement of an action by one M. W. Murray against the Nowell Gold Mining Company on the 11th day of November, 1893, in the district court of Alaska to recover the sum of $25,000, the issuance of a writ of attachment and its levy upon certain property of the defendant on the 24th day of November, 1893. It is alleged that such property was at that time and subsequently subject to the lien of the plaintiff's mortgage of December 15, 1891; that Frank W. Griffin, one of the defendants named in the bill of complaint, was substituted for the said M. W. Murray and as his successor in interest in the attachment suit, and thereafter, on the 10th day of July, 1905, judgment was entered in favor of the said Griffin and against the American Gold Mining Company for the sum of $25,000 and interest; that an order of sale was thereupon issued out of the court upon the judgment, and the property attached was ordered sold by the court. Thereafter a notice of sale was given and published by the defendant Shoup as United States marshal. It is alleged in the complaint that, if the sale is allowed to proceed, the property will be in danger of being sold to parties who have no knowledge of the equities and lien of the plaintiff; that prior to November 3, 1905, plaintiff had no knowledge or notice of the facts pertain-

ing to the attachment suit, but had prior to that time been informed by the officers of the defendant corporation, and believed and relied upon said information and representation, that there were no liens or claims intervening between December 15, 1891, and January 1,. 1896. It is further alleged that in plaintiff's foreclosure suit commenced December 11, 1902, neither Murray nor Griffin was a party to that action, and that the decree of foreclosure against the property of the defendant corporation was entered by the plaintiff in entire ignorance of the existence of the attachment suit by Murray and his successor, Griffin. It is alleged that plaintiff herein is without speedy or adequate remedy at law; that defendant Frank W. Griffin threatens to sell the property mentioned in the complaint and described as having been attached by the plaintiff in the attachment suit; that said property is a part of the property subject to the mortgage of December 15, 1891, by and through which Shoup, as United States marshal, will sell the same unless previously enjoined, to the irreparable loss and damage of the plaintiff.

The prayer of the bill of complaint is that the holders of the 298 bonds issued under the mortgage of January 1, 1896, be subrogated to the rights of the holders of the 298 bonds issued under the mortgage of December 15, 1891; that an account be taken of the moneys due of principal and interest owing on said bonds and mortgage, and that a decree be entered for the sale of the mortgaged premises for the payment to the plaintiff of the moneys found to be due the defendants and all persons claiming under them subsequent to the commencement of the suit; that the premises described in the mortgage of December 15, 1891, be sold to satisfy said sum of $300,000 and interest thereon, and upon the sale of the premises the sum bid be credited upon the amount due under the mortgage, and that plaintiff have judgment for any deficiency there may be for the difference between the amount so bid and the amount found due under the mortgage; that the mortgage of January 1, 1906, be foreclosed in like manner for the sum of $200,000 and interest thereon, and that the premises covered by that mortgage be condemned and sold to satisfy the said sum of $200,000 and interest, and that defendants Shoup and Griffin be enjoined and restrained during the pendency of the suit from the sale of the premises as described in the writ of attachment and published notice of sale; and that further proceedings under said order and notice of sale be stayed and enjoined until final judgment, decree in the action. Upon the verified bill of complaint, the court issued an order restraining the defendants Griffin and Shoup from proceeding with the sale of the property described in the complaint. The temporary restraining order was subsequently continued in force as a temporary injunction. Thereafter a motion was made to the court to dissolve the temporary injunction, which was denied on the ground that the motion presented to the court all the issues practically involved in the merits of the case, and the court was unable to determine the merits of the case upon a motion to dissolve the temporary injunction.

The defendant Griffin appeals from the order denying the motion to dissolve the temporary injunction; and the only question to be

determined by the court is whether the bill of complaint states a cause of action for equitable relief.

We think the express terms of the second mortgage were such as to preserve the lien of the first mortgage for the benefit of the bondholders who should receive bonds under the second mortgage in exchange for bonds issued under the first mortgage. The parties to the two mortgages were the same. The first mortgage was not canceled or released of record, or the plaintiff, as trustee, relieved of its trust under the mortgage; but, on the contrary, the lien was kept alive and the trust continued. The mortgage recited that the holders of $300,000 of bonds issued under the mortgage of December 15, 1891, were "willing to exchange the same for an equal amount of the bonds of the issue of January 1, 1896." Pursuant to this recital the second mortgage contained the express provision that it was "subject only to the mortgage of said last-named party (the Nowell Gold Mining Company) to said party of the second part (the International Trust Company) dated December 15, 1891, and given to secure the payment of said three hundred thousand dollars of bonds of even date therewith which are to be paid by exchanging the same for bonds of said issue of January 1, 1896." Neither the principal or interest of any of these bonds had been paid, and the whole principal had become due at the option of the majority of the bondholders, and the plaintiff, as trustee of these bondholders, was in a position to proceed with the foreclosure of the mortgage given to secure the debt. That it did not do so, and the bondholders did not so request, was because of the plain terms of the mortgage that it was subject to the mortgage of December 15, 1891. The appellant contends that the purchasers of the bonds issued under the mortgage of January 1, 1896, were mere volunteers without any agreement that the mortgage of December 15, 1891, was to be kept alive for their benefit or protection. This is undoubtedly correct with respect to the purchasers of the $200,000 of bonds issued under the second mortgage and sold in the open market for the purpose of providing an additional capital for the use of the Nowell Gold Mining Company; but with respect to the $300,000 of bonds issued for the purpose of exchanging the same for bonds issued under the mortgage of December 15, 1891, the relation of the parties to the transaction was different, and involved different considerations. The bondholders under the first mortgage had a prior lien, which presumably they would not voluntarily surrender until their debt was paid. To carry out the plan of reorganizing the debt of the corporation and enlarging its business, it became necessary to carry the lien of the bondholders under the first mortgage into the second mortgage, in the provision that the second mortgage was subject to the first mortgage, securing the payment of $300,000 of bonds which were to be exchanged for bonds to be issued under the new mortgage. The case of Union Trust Co. v. Illinois Midland, 117 U. S. 434, 6 Sup. Ct. 809, 29 L. Ed. 963, cited by appellant, related to a very different transaction. In that case there was a consolidation of three Illinois railroad companies, and the agreement between the parties in interest was that the bonds of the Illinois Midland Railway Company (the consolidated com-

pany) were to be issued "subject and in subordination only to such bonds already issued by the Paris and Decatur Railroad Company as for the time being shall be existing and be preferentially charged on the portion of the undertaking which shall have been constituted with or represent the undertaking of the last mentioned railway company." Under this agreement the bonds of the consolidated company were subject only to the priority of the bonds of one of the companies entering into the consolidation with respect to the property of that company, while for the "time being" the bonds of the latter company "shall be existing." There was no reservation in the agreement in favor of the first bondholder if he exchanged his bonds for bonds of the consolidated company. The agreement was expressly otherwise. The court says:

"The Paris and Decatur bonds * * * were exchanged and surrendered specifically for cancellation. * * * Each person who surrendered gave up his lien under the Paris and Decatur mortgage, and took one under the Illinois Midland Mortgage, as it was, and took the risk of its value. * * * There was no contingency and no reservation on the part of those surrendering. The surrender was for cancellation and was cancellation. * * * All parties got what they contracted for."

The acceptance of bonds issued under the second mortgage in substitution for bonds issued under the first mortgage worked a cancellation of the lien of the first mortgage, because that was one of the terms of the agreement between the parties to the transaction under which the bonds were exchanged. There was no such agreement in the present case, and no cancellation of the first lien. On the contrary, the lien was preserved in the second mortgage, under the terms of which the exchange of bonds was made. The question in such a case is one of agreement or intention of the parties, and, as said by the Circuit Court of Appeals in the Seventh Circuit, in Mowry v. Farmers' Loan & Trust Company, 76 Fed. 38, 43, 22 C. C. A. 52, 56:

"The question must be resolved in each case upon the facts of the particular transaction. Where a novation is thus sought to be established, it must be shown that the substitution of the new obligation was with design and intent to extinguish the old obligation, and, as such an act would upon its face appear to be against the interest of the holder of the bond, such intent will not be presumed, but must be clearly established. A mere change in the form of the mortgaged debt such as the substitution of new bonds for those originally secured by it would not extinguish or affect the lien."

To same effect is Fidelity Insurance, Trust & Safe Deposit Co. v. Shenandoah Val. R. Co., 86 Va. 1, 9 S. E. 759, 19 Am. St. Rep. 858.

The equitable jurisdiction of a court of equity is not, however, limited to granting relief to a bondholder under a second mortgage against the claim of an intervening lien when there is some agreement or other evidence of an intention to continue the prior lien for the benefit of the holders of the second mortgage. The court may grant relief by way of subrogation when the prior lien has been surrendered and canceled in ignorance of the existence of the intervening lien, or where by reason of any other fact it would be manifestly inequitable to admit the claim of the intervening lien to a priority. In such case the holder of the second lien is deemed in

equity to have succeeded to the right of the prior lien by an equitable assignment.

In the case of the International Trust Company v. Davis & Farnum Mfg. Co., 70 N. H. 118, 46 Atl. 1054, the action was a bill in equity to restrain the levy of execution against an electric light company, except in subordination to the rights of bondholders. In 1895 the corporation issued bonds to the amount of $50,000 secured by a mortgage running to the plaintiff as trustee. The mortgage was recorded August 14, 1895. In January, 1896, because the validity of the bonds was questioned they were canceled, the mortgage discharged and a new issue made for $40,000 and secured by a like mortgage. The new bonds to the amount of $30,000 were substituted for the former issue. In September and October, 1895, the light company's real estate was attached by creditors, and, having obtained judgment, they were about to levy upon it when they were enjoined. The question was whether the attachments levied in September and October, 1895, were prior liens to the mortgage executed in January, 1896, which secured bonds issued in exchange for bonds issued under the prior mortgage recorded in August, 1895. In this case the prior bonds had been canceled, and the prior mortgage discharged. The court held that:

"The discharge of the prior mortgage and the taking of the later one in its stead did not affect the rights of the parties. A discharge of a mortgage is always treated as an assignment, when justice requires such a course for the protection of equitable rights. Holt v. Baker, 58 N. H. 276, and cases cited. The attaching creditors have not done or omitted to do any act relying upon the recorded discharge (Holt v. Baker, supra), and cannot complain because the transaction is given the effect intended by the parties thereto. By their attachments these creditors became subsequent incumbrancers, against whom the rule of equitable assignment has frequently been applied. Hammond v. Baker, 61 N. H. 53, and cases cited."

In Pearce v. Buell, 22 Or. 29, 29 Pac. 78, the holder of a mortgage released his mortgage, and took a second mortgage in ignorance of an intervening judgment lien. It was held that the mortgagee was entitled to have his original mortgage restored as against the judgment lien. The court, in discussing the question, said:

"In such a case a court of equity will look through the form to the substance, and keep alive the original security, if it can be done without injury to third parties. No rule of law is better settled than if a holder of a mortgage take a new mortgage as a substitute for a former one, and cancel and release the latter, in ignorance of the existence of an intervening lien upon the mortgaged premises, although such lien be of record, equity will, in the absence of the intervening rights of third parties, restore the lien of the first mortgage, and give it its original priority. Jones, Mortg. § 972; Geib v. Reynolds, 35 Minn, 331, 28 N. W. 923; Bruse v. Nelson, 35 Iowa, 157; Downer v. Miller. 15 Wis. 677; Vannice v. Bergen, 16 Iowa, 555, 85 Am. Dec. 531; Robinson v. Sampson, 23 Me. 388; Corey v. Alderman, 46 Mich. 540, 9 N. W. 844; Cansler v. Sallis, 54 Miss. 446. The fact that the mortgage was released in ignorance of the existence of the intervening lien is, in equity, deemed such a mistake of fact as to entitle a party to relief, although such lien may have been of record. Bruse v. Nelson, supra; Cobb v. Dyer, 69 Me. 494; Geib v. Reynolds, supra."

In 27 Cyc. 1222, the law relating to the substitution or renewal of a mortgage, is stated as follows:

"Entering satisfaction of a mortgage and taking a new one, when designed by the parties to be merely a continuation of the first mortgage, and when the two acts are practically simultaneous or parts of the same transaction, is not an extinguishment of the mortgage, but a renewal thereof, and does not give priority to an intervening judgment or mortgage creditor of the mortgagor, especially where it is done in good faith, in ignorance of the existence of the intervening lien, and without any intention to release the lien of the mortgage."

In Jones on Mortgages, § 971, the law applicable to this case is fully stated, as follows:

"When a new mortgage is substituted in ignorance of an intervening lien, the mortgage released through mistake may be restored in equity and given its original priority as a lien. This was done in a case where the holder of a first mortgage, in ignorance of the existence of a subsequent one on the premises, released his mortgage and took a new one. There was no evidence of mistake except such as might be inferred from the mortgagee's ignorance of the existence of the intermediate mortgage, and there was no evidence that he would not have made this arrangement had he known this fact; but it was considered that, although the court was not at liberty to infer facts not proved, yet that it was at liberty to draw all the inferences which logically and naturally follow from the facts proved; that it is not an act of reasonable prudence and caution such as men commonly use in the conduct of business affairs for one having a first mortgage upon property, without consideration or other apparent motive, to release it, and take a new mortgage subject to a prior lien of a considerable amount; and therefore it may be inferred that the mortgagee would not have made the release had he known of the intervening mortgage. A court of equity will grant relief on the ground of mistake, not only when the mistake is expressly proved, but also when it is implied from the nature of the transaction.

"Where a new mortgage is taken to secure the payment of the same debt, and the fact is so stated in the mortgage, and the old mortgage is released and the new one recorded on the same day, the new mortgage will have priority of any intervening incumbrance. Where a second mortgagee, in order to enable the mortgagor to renew a first mortgage and give it priority as a lien, canceled his mortgage and took a new one to secure the same notes, subject to the renewed first mortgage, he did not thereby release the lien created by his original mortgage, and the mortgagor's wife obtained no new rights as against the second mortgagee."

Authorities might be multiplied, showing the various considerations that will justify a court in protecting a bondholder who has surrendered the evidence of a lien to accept a new one when the claim of an intervening lien threatens to deprive him of the equitable right to the prior lien, but the cases already cited are sufficient, we think, to establish the equitable right of the bondholders in this case to their prior lien upon the facts stated in the complaint.

The appellant makes the further objection that the appellee has been guilty of such gross and inexcusable laches and negligence that the appellee and the bondholders are precluded from seeking relief in a court of equity. This objection is based upon the allegation of the complaint that prior to November 3, 1905, plaintiff and the bondholders under the first mortgage had no knowledge or notice of the attachment suit, "but had prior thereto been informed by the officers of the defendant corporation, and believed and relied on said information and representation, to wit, that there were no liens or claims intervening between December 15, 1891 and January 1, 1896." It is contended that the appellee should have examined the official rec-

ords at Juneau, and discovered the Griffin attachment and made him a party to the foreclosure proceedings; but Griffin has not been prejudiced in any of his rights by the foreclosure proceedings. Upon the facts stated in the complaint, we have determined that his attachment was subject to the mortgage lien under the mortgage of December 15, 1891, and that this lien was carried into the mortgage of January 1, 1896, either in express terms or was preserved by the doctrine of equitable assignment for the benefit of the bondholders under the mortgage of December 15, 1891, who exchanged their bonds for bonds under the mortgage of January 1, 1896. This being so, the Griffin attachment created a lien only on the mortgagor's equity of redemption, and the only effect of the failure of the mortgagee to make the attaching creditor a party to the foreclosure suit was to leave him with the right of redemption, in the event he obtained a judgment on his claim. London & San Francisco Bank v. Dexter, Horton & Co, 126 Fed. 593, 61 C. C. A. 515. Griffin obtained judgment on July 10, 1895. The appellee learned of his claim and judgment November 3, 1905, and brought this suit on December 19, 1905, to set aside the foreclosure suit and obtain a decree foreclosing both mortgages in accordance with the rights of the respective bondholders, and for the foreclosure of all rights of redemption. In this action Griffin's rights will be protected as fully as though he had been a party to the original foreclosure suit.

Under this aspect of the case, we cannot, under the facts stated in the complaint, hold that the appellee and bondholders are chargeable with such negligence that they cannot seek relief in a court of equity. We are of opinion that the complaint states a cause of action for equitable relief, and that the court was right in denying appellant's motion to dissolve the temporary injunction.

The order of the District Court is affirmed.