## MARTIN v. HICKENLOOPER et al.

No. 5424.   Decided January 10, 1935.   [40 P. (2d) 213.]

*Vernon Snyder* and *H. Van Dam Jr.*, both of Salt Lake City, for appellants.

*Irvine, Skeen & Thurman* and *A. R. Barnes*, all of Salt Lake City, for respondents.

MOFFAT, Justice.

The relationship of the parties to the action will appear from a statement of the transactions out of which this cause arose. The Utah Savings & Trust Company is the receiver of the Fritsch Loan & Trust Company and is interested only as such receiver.

It appears that C. H. Stoven was the owner of the tract of land sought to be subjected to foreclosure of a mortgage back about the year 1921. On or about February 1, 1921, C. H. Stoven and Florence M. Stoven executed a promissory note and a mortgage securing the same to the state of Utah for the sum of $3,500.

On or about June 20, 1921, C. H. Stoven and wife conveyed the real estate and water rights so mortgaged to Clara C. Hickenlooper, subject to the mortgage to the state of Utah.

On or about June 20, 1921, and while Clara C. Hickenlooper was the owner of the property, subject to the mortgage to the state of Utah, she and her husband borrowed from the plaintiff Brigham J. Martin the sum of $2,500, giving there-

for their promissory notes, one for $1,000 and one for $1,500 secured by a mortgage upon the real property only. The $1,000 note was subsequently paid.

On or about February 24, 1922, Clara C. Hickenlooper by deed conveyed the real estate and water rights subject to the mortgage of the state of Utah, also subject to the mortgage of the plaintiff, Brigham J. Martin, to the Fritsch Loan & Trust Company, a corporation.

On or about June 1, 1927, the defendant Fritsch Loan & Trust Company, a corporation, by its agent, secretary, and manager, W. H. Penner, represented to Mrs. W. Zorn, the defendant and cross-complainant, as alleged by her, that the said corporation was the owner of the real estate and water rights subject only to the mortgage in favor of the state of Utah, and told Mrs. Zorn that, if she would advance the sum of $3,500 to pay off and discharge the mortgage held by the state of Utah, the Fritsch Loan & Trust Company would give to her a mortgage upon the whole of said properties which mortgage would constitute a first and prior lien on the real property and water rights, and the whole thereof.

On June 1, 1927, in pursuance of the representations of the Fritsch Loan & Trust Company, as further alleged, Mrs. W. Zorn paid to the state of Utah the sum of $3,500, and thereupon the state of Utah made and executed a release of its mortgage, which release was on June 3, 1927, recorded in the office of the county recorder of Salt Lake county, and the certificates evidencing the title to the water rights were delivered to the Fritsch Loan & Trust Company.

On June 1, 1927, the Fritsch Loan & Trust Company executed and delivered to Mrs. W. Zorn a promissory note in the sum of $3,500, and to secure the payment of said note gave to Mrs. W. Zorn a mortgage covering the real estate and water rights, and delivered to her the stock certificates evidencing the title or right to the water.

Upon substantially the foregoing statement of facts, which is in accordance with the pleadings, evidence was submitted, and the trial court found and concluded, that the mortgage

of Mrs. W. Zorn constituted a first and prior lien upon the real estate and water rights, said water rights being represented by certificate No. 125 for 21 shares of the capital stock of the South Despain Ditch Company, certificate No. 63 for 20 shares, and certificate No. 52 for 2 shares of the North Dry Creek Irrigation Company. The court further found and concluded that the mortgage of the plaintiff and cross-defendant Brigham J. Martin was subject and junior to the mortgage of Mrs. W. Zorn; that Mrs. W. Zorn was entitled to be subrogated to all of the rights of the state of Utah under the mortgage given by the Stovens to the state of Utah.

Judgments were duly entered and orders of foreclosure made in accordance with the findings and conclusions of the court whereby Mrs. W. Zorn was given judgment against C. H. Stoven and Florence M. Stoven and Utah Savings & Trust Company, a corporation, as receiver for Fritsch Loan & Trust Company, in the sum of $3,739.15, principal and interest, with attorney's fees and costs. The plaintiff and cross-defendant Brigham J. Martin was given judgment against the defendant and cross-defendant Clara C. Hickenlooper in the sum of $1,700, principal and interest, with attorney's fees and costs.

The mortgaged property was directed to be sold and the proceeds applied, first, to the costs and expenses of sale and attorney's fees, and, second, to the payment of the amount due to defendant and cross-complainant Mrs. W. Zorn and any overplus to the plaintiff and cross-defendant Brigham J. Martin, and then any further overplus to C. H. and Florence M. Stoven, Clara C. Hickenlooper, and the Utah Savings & Trust Company in the order named.

The plaintiff and cross-defendant Brigham J. Martin and the cross-defendants C. H. Stoven and Florence M. Stoven appeal.

The errors assigned are numerous, some of them relating to the admission and exclusion of evidence, some of them challenging the findings on various grounds, and some be-

cause of failure to make findings. The gist of all the errors assigned may properly be converted into the question of the priority of the liens as between the plaintiff and cross-defendant Brigham J. Martin and the defendant and cross-complainant Mrs. W. Zorn.

The record discloses that the plaintiff, Brigham J. Martin, filed his complaint in the district court of the Third judicial district making all the other parties defendants except the Stovens, on the 24th day of October, 1931. All parties defendant were duly served with summons either personally or by publication or both.

On the 25th day of February, 1932, the defendant Mrs. W. Zorn filed her petition asking for an order to make C. H. Stoven and Florence M. Stoven parties, and on the same day filed her answer and cross-complaint setting forth the claim and alleging her right to be subrogated to the mortgage made by C. H. Stoven and Florence M. Stoven, his wife, to the state of Utah on the 1st day of February, 1921, and setting forth that the money loaned by her to the Fritsch Loan & Trust Company was for the purpose of paying off the state mortgage, and that she was to have a first mortgage.

The state mortgage was to run for five years, and was one year past due when it was paid with the money loaned by Mrs. Zorn to the Fritsch Loan & Trust Company.

Aside from the documentary evidence contained in the notes, mortgages, a check of the state land board and abstract of title, most of the facts, having been stipulated as to dates, recording, and execution of documents and parties concerned, consist of the uncorroborated evidence of Mrs. W. Zorn.

The substance of her testimony is to the effect that she had known Mr. Penner, manager of Fritsch Loan & Trust Company, since about 1916; that in May, 1927, she had a conversation with Mr. Penner relative to lending the Fritsch Loan & Trust Company a sum of money; that a second conversation about a week later was had June 1, 1927, with

Mr. Penner at the company's office, when Mr. Green, the bookkeeper, was present, as she remembered. (Mr. Green denied or failed to remember being present at any such conversation.)

That

"He (Mr. Penner) said he got a farm—a loan on a farm for $3,500 on a farm, and he wanted to show me the place."
"Then on June 1, 1927 he took me up to the Capitol." "He said he would send me the first mortgage."

Mrs. Zorn further testified: That she did not know anything about the Martin mortgage. That Mr. Penner told her the state mortgage was a first mortgage. On May 19, 1927, Mrs. Zorn secured from Walker Bros. Bank & Trust Company a cashier's check for $3,500, payable to herself, which she indorsed to the State Land Board of the state of Utah and "turned it over to the state capitol to pay that mortgage." That about that time she received the abstract to the real estate, the water certificates, the note, and, shortly after, her mortgage of the Fritsch Loan & Trust Company for $3,500 after it had been recorded. That she had had the abstract in her possession all the time. That she first learned about the Martin mortgage when the foreclosure suit was brought. That she relied entirely upon, and trusted, Mr. Penner, and that he assured her he had his lawyer look it over. That Mr. Penner said, "Everything is all right." That she did not have the abstract examined by an attorney, nor did she examine it or the records in the county recorder's office, nor have them examined. That she had possession of the abstract since about June 1, 1927. That the interest on her note and mortgage had been paid by the Fritsch Loan & Trust Company.

That her mortgage had been recorded at her request June 13, 1927. That she had never received any canceled papers of the state's note or mortgage nor the release, nor any assignment of the state's mortgage, and that there was no written agreement relating to the matter of her being sub-

rogated to the rights of the state's mortgage. That she had never prior to the filing of the foreclosure suit talked to Mr. or Mrs. Stoven or to Mr. Martin.

The answers and stipulations of the Stovens and Martin to the cross-complaint of the defendant and cross-complainant, Mrs. W. Zorn, admit the facts as relating to the making of the loan to the Fritsch Loan & Trust Company, the payment of the state mortgage, its release, the matters relating to recording, and the dates of the respective transactions. The allegations as to any agreement tending to establish a right of subrogation are denied.

No questions are presented by the pleadings as to the statute of limitations, matters of negligence on the part of the cross-complainant, nor are there presented any issues as to any changed position assumed or that may have arisen on the part of the Stovens or Martin in reliance upon the situation created by the release of the mortgage of the state. There are some allegations in the answers and reply to the effect that, because of conduct, acts, and omissions on behalf of the cross-complainant, Mrs. Zorn, she is estopped from asserting any right or claim to have the mortgage in favor of the state of Utah reinstated as against the real property.

In this connection it is to be observed that the state mortgage included the real estate and water rights, as did also the deed from the Stovens to Hickenlooper, and the deed from Hickenlooper to the Fritsch Loan & Trust Company. Mrs. Zorn's mortgage included the water rights, but the Martin mortgage does not. So Mr. Martin has no claim to the water rights under his mortgage, and is not asserting any such claim, so that the only question relates to priority of liens and liabilities of the parties depending upon whether or not the right of subrogation is recognized and applied as to Mrs. W. Zorn.

Under circumstances analogous to the situation presented here, courts of equity have recognized and applied the principle of "conventional subrogation" as distinguished from that of "legal subrogation." The distinction is recognized

in the case of *Bingham* v. *Walker Bros., Bankers*, 75 Utah 149, 283 P. 1055, 1063, where it is said that, when a person, who stands in the situation of a surety or is compelled in order to protect his own right or property, pays the debt of another,

"the right of subrogation is a consequence which equity attaches to such a condition, and the right of subrogation under such circumstances is not the direct result of an agreement. This, in law, is 'legal subrogation.' "

The defendant and cross-complainant does not claim to come under the principle of "legal subrogation." Her position is that under the principle of "conventional subrogation" she is entitled to the benefits of the lien created by the mortgage given by C. H. Stoven and wife to the state of Utah on June 1, 1923.

This principle of "conventional subrogation" is applied in a variety of cases. Some cases apply the doctrine upon the basis of a contract express or implied that the lien to which the subsequent lienholder claims to have his lien advanced over an intervening lienholder, to the position of the lien discharged by payment of the prior or superior lien, was agreed to be kept alive. Some of the cases discuss the question of when "negligence" or "gross negligence" on the part of the person claiming the right of conventional subrogation will cause a court of equity to withhold its hand and deny subrogation where the payment of the superior lien and the taking of an inferior one was induced by fraud; some go to the extent, at least some of the statements would seem to go so far as to allow subrogation regardless of contract express or implied, when payment has been made, provided the intervening lien claimant has not been injured, the principle being put upon the broad ground that the intervening incumbrancer's position has not been changed or the restoration of the prior lien would allow the intervening lienholder to unjustly profit by the fraud or mistake of the former and to avail himself of the fruits of a fraud perpetrated or mistake made.

This court has heretofore recognized the principle of "conventional subrogation," and placed the doctrine squarely upon that of contract, express or implied. In the case of *Bingham* v. *Walker Bros.*, Bankers, supra, it is said:

" 'Conventional subrogation,' which occurs where the one who is under no obligation to make the payment, and who has no right or interest to protect, pays the debt of another under an agreement, express or implied, that he will be subrogated to rights of the original creditor, made with either the debtor or creditor"—citing cases.

So far this court has not committed itself to the further position, in the absence of either "legal subrogation" or "conventional subrogation" as limited and defined in the case of *Bingham* v. *Walker Bros.*, *Bankers*, supra, that subrogation may be had upon the ground of unjust enrichment alone either with or without negligence on the part of the party claiming the right of subrogation.

The Utah recording statute is rather definite as to the fact of notice and the effect upon subsequent purchasers, mortgagees, and lienholders.

Appellant cites and relies upon the case of *George* v. *Butler*, 16 Utah 111, 50 P. 1032, 1034. In many of its aspects that case is strikingly analogous in its facts. In some features it is clearly distinguishable. Whether or not it is controlling must depend upon the facts. The principle of law is applicable, but, as has been said in many other cases, each case must be determined upon its own facts.

In the case of *George* v. *Butler* the facts are:

Butler held certain real estate under lease for a term of years. On the date the lease was obtained by B. he assigned it to P. to secure a debt of $2,500. B. afterwards mortgaged the same premises to G. The mortgage was recorded, but the property was erroneously described as "lot 5" instead of "lot 6." Afterwards B. made a trust deed to secure the first loan of $2,500 and an additional loan of $1,000, which deed was accepted by P. without actual knowledge of G.'s mortgage. Later B. made a mortgage to S. to

secure $3,500 borrowed from S. to pay the loan owing to P. S. had no actual knowledge of G.'s mortgage. The abstract, because of the error in description, did not disclose G.'s mortgage. G.'s agent had actual knowledge of the loan of $2,500 and security given to P. with which G. was charged. S. believed he was getting a first lien for the $3,500 paid. The court, however, gave him subrogation of the lien of P. to the extent of $2,500, saying that G. could not be prejudiced by the substitution of S. for the lien of P. to the extent of the amount of the lien against the property when G. advanced the $1,000 and took a mortgage as security.

The questions of notice, or the effect of the recording statute or the error in G.'s mortgage description, or the omission of any reference to G.'s mortgage in the abstract are not discussed. The court in disposing of the matter does say:

"No change is made in the rank or relative priority of the securities. The transaction consisted of mere immaterial changes as to its effect upon the plaintiff's [G's] equities. Equity applies the doctrine of subrogation to a great variety of situations and emergencies arising in human affairs. Its end is substantial justice, and we think it applicable to the facts of this case.

"Tested alone by the earlier cases, Sutherland might be regarded as a volunteer, but latterly the doctrine of subrogation has been developed and expanded, and given a wider application to business matters. By analogy it has been applied to transactions similar to the one under consideration,—to one having no previous interest to protect, who pays off a mortgage, or advances money for its payment, at the instance of the mortgagor, and for his benefit, when no innocent person can be injured, believing he is getting security equal to that of the person whose debt he pays. We cannot hold Sutherland to be a mere volunteer or stranger, officiously intermeddling by paying the debts due the Pacific Investment Company"—citing cases.

The doctrine of the case of *George* v. *Butler*, supra, is cited and approved in the case of *Fullerton* v. *Bailey*, 17 Utah 85, 53 P. 1020, 1023. The facts appear to be that F. had purchased the property of an estate from the sole legatee, believing that the mortgage given to L. by the deceased

was the only incumbrance. F. then paid the mortgage. Subsequently a claim by a brother of deceased was allowed by the court against the estate, amounting to sufficient to absorb the entire estate, and left F. without anything to reimburse himself for the money paid to satisfy the mortgage. F. sought subrogation. The court said:

"The facts, to my mind, present a clear case calling for the application of the doctrine of subrogation, which is not alone founded upon contract, either express or implied, but upon principles of equity and justice, intended to offer protection to a meritorious creditor, which does not conflict with the legal or equitable rights of others, and prevents a sweeping away of the fund from which, in good conscience, he ought to be paid, and which should properly be applied to reimburse one who has been compelled to pay the debt of a third person in order to protect his own rights or save his own property. Sheld. Subr. (2d Ed.) §§ 4-9; *George* v. *Butler*, 16 Utah 111, 50 P. 1032; *Johnson* v. *Tootle*, 14 Utah 488, 47 P. 1033; *Spaulding* v. *Harvey*, 129 Ind. 106, 28 N. E. 323 [13 L. R. A. 619, 28 Am. St. Rep. 176]; *Acer* v. *Hotchkiss*, 97 N. Y. 396; *Duncan* v. *Gainey*, 108 Ind. 579, 9 N. E. 470; *Edwards* v. *Davenport* [C. C.] 20 F. 756; *Crippen* v. *Chappel*, 35 Kan. 495, 11 P. 453 [57 Am. Rep. 187]; 3 Pom. Eq. Jur. § 1419."

It would appear from the later distinctions, and as announced in the case of *Bingham* v. *Walker Bros., Bankers,* supra, that the case of *George* v. *Butler* is a case in which the doctrine of "conventional subrogation" was applied, while the case of *Fullerton* v. *Bailey*, supra, falls within the definition of "legal subrogation," and they are to the effect that those distinctions are of no serious consequence if the facts and principles of law are understood and applied to the given case.

In none of the Utah cases have we found discussed the effect of the recording statute when the recorded document was free from error and the recording properly made, indexed, and abstracted. In the instant case the statute is cited and relied upon as one of the elements at least tending to affect the position of the respondent Mrs. Zorn. There are cases in which the doctrine of subrogation has been

applied notwithstanding the constructive record notice existed.

"The application of the doctrine is not determined by the existence or absence of a contract, but is founded upon the facts of a particular case and upon principles of natural justice." *Di Giovanni* v. *Giliberto*, 139 Misc. 616, 248 N. Y. S. 82, 86.

"So it may be said that equity may apply the doctrine, although the contract does not, either expressly or by legal implication, call for it, but it will not apply if the contract either expressly or by legal implication forbids it. The parties may not have had subrogation in their minds at all when they made the contract, but that fact alone would not control in a question of application of the doctrine. Equity will apply it, though the parties may never have thought of it, if it is not inconsistent with the contract or in violation of any one's legal rights, and if justice demands it." *Southern Cotton Oil Co. et al.* v. *Napoleon Hill Cotton Co. et al.*, 108 Ark. 555, 158 S. W. 1082, 1084, 46 L. R. A. (N. S.) 1049, quoting from *Capen* v. *Garrison*, 193 Mo. 335, 92 S. W. 368, 5 L. R. A. (N. S.) 838.

"The chancellor has found, and has apparently turned the case upon, the facts that the Ritchie mortgage was properly recorded, and that the plaintiff could readily have learned from the records that such a mortgage had been given. The doctrine of constructive notice is not applicable; and we think the findings regarding the record do not constitute a defense. An examination of the records would have disclosed the incumbrance, but the question is whether an examination was required by the rule of diligence applicable to the case. This is not a case where the relief of the plaintiff will cause an actual loss to the defendant. Ritchie has not increased his investment since the payment of the lien note, and a reinstatement of the security will simply leave him in his original position. He will lose nothing but the gain which would otherwise have accrued to him from the plaintiff's mistake. Nothing short of very culpable negligence will bar relief in these circumstances. Parties who have paid prior liens at the request of the debtor in ignorance of the existence of subsequent incumbrances have been held entitled to the remedy of subrogation, notwithstanding a failure to examine the records. *Emmert* v. *Thompson*, 49 Minn. 386, 52 N. W. 31, 32 Am. St. Rep. 566; *Bruse* v. *Nelson*, 35 Iowa 157. And see generally, *Wilkins* v. *Gibson*, 113 Ga. 31, 38 S. E. 374, 84 Am. St. Rep. 204; *Home Sav. Bk.* v. *Bierstadt*, 168 Ill. 618, 48 N. E. 161, 61 Am. St. Rep. 146; *Heisler* v. *Aultman*, 56 Minn. 454, 57 N. W. 1053, 45 Am. St. Rep. 486; *Seeley* v. *Bacon* (N. J. Ch.) 34 A. 139; 2 Pom. Eq. Jur. § 856." *Hill* v. *Ritchie et al.*, 90 Vt. 318, 98 A. 497, 498, L. R. A. 1917A, 731.

It was argued in the case of *Louisville Joint Stock Land Bank* v. *Bank of Pembroke*, 225 Ky. 375, 9 S. W. (2d) 113, 116, that, as the junior mortgage was on record when party seeking subrogation paid the money to discharge the first mortgage, being charged with knowledge could not because of negligence claim subrogation. The abstracter had negligently omitted the entry relating to the intervening mortgage from the abstract.

"A distinction is sought to be discovered in the circumstance that the new mortgage was taken by a new party who lent the money to pay the first mortgage held by another. *U. S.* v. *Grover* (D. C.) 227 F. 181. But the equity does not arise from the fact that the same party has taken a new mortgage, but because the money of the claimant has been used to discharge the anterior lien under a mistaken belief that he would have a like security.

"In some cases the money has been lent, as in this case, expressly for the purpose of paying the prior lien, and, when the new security taken at the time became unavailable or less valuable, restoration of the first lien was decreed to the lender. *Emmert* v. *Thompson*, 49 Minn. 386, 52 N. W. 31, 32 Am. St. Rep. 566; *Home Savings Bank* v. *Bierstadt*, 168 Ill. 618, 48 N. E. 161, 61 Am. St. Rep. 146.

"The principles we have announced permeate the equity jurisprudence of this country, and have found application in a wide range of cases arising under circumstances somewhat variant, but substantially similar to those here appearing. *Seeley* v. *Bacon* (N. J. Ch.) 34 A. 139; *Institute Bldg. Ass'n.* v. *Edwards*, 81 N. J. Eq. 359, 86 A. 962; *Griffin* v. *International Trust Co.* (C. C. A.) 161 F. 48; *Matzen* v. *Shaeffer*, 65 Cal. 81, 3 P. 92; *Gans* v. *Thieme*, 93 N. Y. 232; *Yaple* v. *Stephens*, 36 Kan. 680, 14 P. 222; *Bacon* v. *Goodnow*, 59 N. H. 415."

The case of *Merchants' & Mechanics' Bank* v. *Tillman et al.*, 106 Ga. 55, 31 S. E. 794, 796, on the question of constructive notice and subrogation, says:

"Again, it is insisted that Tillman is not entitled to any relief because, by the exercise of ordinary prudence, he could have discovered all the facts, and taken the necessary steps to protect himself. As above pointed out, however, the mistake made by him was one of fact, not of law, in supposing the papers taken by him as security constituted a first lien on the property. He had no actual knowledge

of the bank's mortgage, though it is true he had constructive notice thereof, the same having been duly recorded. 'To be sure, he might have learned the fact of the existence of (this lien), had he exercised the prudence of a man of business dealing with a stranger in relation to land,' title to which was claimed by the latter. 'But a searching of the record (was) not indispensable.' *Cobb* v. *Dyer,* supra [69 Me. 494], citing *Grimes* v. *Kimball,* 3 Allen [Mass.] 518, 522. The doctrine of constructive notice is resorted to from necessity, its object being to protect the rights of innocent third persons, and should never be applied in favor of parties not entitled to the protection it affords."

In the case of *Shields et al.* v. *Pepper,* 218 Ala. 379, 118 So. 549, 550, the court says:

"Under the averments of Pepper's crossbill, the Whitt-Hall mortgage was outstanding when the lands were purchased by Robinson. He acquired only an equity of redemption therein to which the statutory lien attached. Pepper loaned the money to pay this mortgage, and paid it to the holder. Pepper took a mortgage for his loan, and the Whitt-Hall mortgage was satisfied and canceled.

"Under these facts Pepper has a clear right of subrogation, a revival of the equitable lien of the Whitt-Hall mortgage for his protection against the intervening lien created by statute. He was not a volunteer merely paying off the debt of another. That the mortgage was satisfied, was not kept alive by the parties, does not defeat, but furnishes the occasion for assertion of, the equitable right of subrogation. *Shields* v. *Hightower,* 214 Ala. 608, 108 So. 525, 47 A. L. R. 506; *Fidelity & Deposit Co.* v. *Richeson,* 213 Ala. 461, 105 So. 193; *Faulk* v. *Calloway,* 123 Ala. 325, 26 So. 504; *Hampton* v. *Counts,* 202 Ala. 331, 80 So. 413; *First Ave. Coal & Lbr. Co.* v. *King,* 193 Ala. 438, 69 So. 549; *Cook* v. *Kelly,* 200 Ala. 133, 75 So. 953."

The following cases, each with a set of facts slightly different from the other, but sufficiently analogous to claim application of the doctrine of subrogation, have applied the doctrine and cited cases: *Hughes Co. et al.* v. *Callahan,* 181 Ark. 733, 27 S. W. (2d) 509; *Jackson Trust Co.* v. *Gilkinson et al.,* 105 N. J. Eq. 116, 147 A. 113.

The question as to whether negligence in not examining the record is of sufficient importance to defeat the application of the doctrine of subrogation is considered and held not

to be available where no prejudice is shown to the intervening lienholder in a number of cases:

"The finding of the referee that the defendants were negligent in not discovering that the plaintiff had a lien upon the land when they took their mortgage does not constitute a reason why he should have the benefit of the money they advanced for the discharge of the Kelly mortgage. The effect of a failure to examine the records upon one's right to subrogation was a question presented by counsel in *Hammond* v. *Barker*, supra [61 N. H. 53] see 131, Briefs & Cases 325, 351), but it was not considered to be of sufficient importance to defeat the application of the doctrine of subrogation. Indeed, in most of the cases upon this subject it is apparent that the mistake of the party claiming subrogation might have been avoided by reasonable investigation as to the state of the title. The absence of such investigation does not prejudice the second or subsequent lienholder; for, if his lien were discovered, the party paying off the first mortgage by taking an assignment of it would be preferred to the lienholder, while if it were not discovered the latter suffers no damage in his security by a decree giving the former the rights of the first mortgagee by an assignment of it, or, what amounts to the same thing, by an order of subrogation. The principle is that the lienholder's equitable rights are not infringed, impaired, or in any respect changed by the mere fact that the other party was negligent of his own rights in not discovering the existence of the lien." *Fifield* v. *Mayer et al.*, 79 N. H. 82, 104 A. 887, 889.

Also:

"Appellees insist that, if subrogation is granted in this case, *Bohn Sash & Door Co.* v. *Case*, 42 Neb. 281, 60 N. W. 576, and *Rice* v. *Winters*, 45 Neb. 517, 63 N. W. 830, must be overruled. We do not so understand the holdings in those cases. It does not appear in the Rice Case that there was an agreement with the debtor to give a first lien by the new mortgage to take the place of the older mortgage nor in the Rice Case or Bohn Case that the persons who advanced the money to take up the prior valid mortgages were relying upon their new securities to take the place of the old ones. Commissioner Ryan in the Born Case, page 298, 42 Neb. (60 N. W. 581) says: 'It is not enough to entitle to subrogation that with the proceeds of the Myers mortgage prior mortgages have been discharged. "The real question in all such cases is whether the payment made by the stranger was a loan to the debtor through a mere desire to aid him or whether it was made with the expectation of being

substituted in the place of a creditor. If the former is the case, he is not entitled to subrogation; if the latter, he is." ' In other words, they paid off the first liens without the intention to hold their right to succeed to the lien of the prior mortgages, and without the agreement of the debtor that the new mortgages were to be a first and prior lien. The facts in those cases were somewhat different from the case at bar. Appellees also cite *Webber* v. *Frye*, 199 Iowa, 448, 202 N. W. 1. The facts in that case, in the opinion of that court, were not sufficient to invoke the rule of subrogation for the party because of inexcusable negligence, and that he did not intend to hold right to be subrogated to the original lien; but in that case the court held: 'One furnishing funds for payment of mortgage and accepting new mortgage is subrogated to rights of mortgagee whose mortgage he pays only if he acts without intent to waive or relinquish the lien of mortgage so paid.' That is the equitable principle adopted in the Nebraska cases above cited." *George A. Hoagland & Co.* v. *Decker*, 118 Neb. 194, 224 N. W. 14, 15.

Without multiplying citations, and they might be greatly extended, the rule of subrogation is generally applied if the money is advanced to a debtor to discharge an existing prior lien with the understanding that the lender is to have a first lien for the repayment of the money loaned to the extent the money loaned is applied in the liquidation of superior liens and to prevent a junior incumbrancer from being raised to the dignity of a first lien and thus be enriched at the expense of another.

To this general statement of the rule of subrogation there are in the cases recognized exceptions or situations that defeat the application of the rule. They are:

(1) Relief will not be granted to a volunteer; (2) relief will not be granted where the party invoking subrogation has been guilty of negligence, sometimes stated as culpable, inexcusable, or gross negligence; and (3) where to grant relief such relief would operate to the prejudice of another.

Is the defendant and cross-complainant, Mrs. W. Zorn, subject to defeat of her claimed right of subrogation because of any of the exceptions to the general rule? As to her being

a mere volunteer, the cases cited and the weight of authority excludes her from the exception of being a volunteer. She may not be denied subrogation upon that ground. She is not a volunteer. As to the question of negligence, the problem, especially under the Utah recording statutes and in view of the cases where recording statutes have been considered, is not free from difficulty. As regards the plaintiff, Martin, there is no evidence in the record that his position was changed or affected adversely at the time of the payment and cancellation of the state's mortgage. If anything affecting him subsequently happened, it is not pleaded nor shown directly by the evidence. The plaintiff, Martin, by answer and reply to defendant and cross-complainant Zorn, pleaded estoppel, apparently based upon knowledge because of notice arising out of the recording statute, and the entries in the abstract delivered to her at the time of the taking of her own mortgage. In addition thereto, there has arisen since the making of the Zorn mortgage the insolvency of the Fritsch Loan & Trust Company, or at least its passing into the hands of a receiver, and the statements by counsel in the record would justify the conclusion that a judgment against the Fritsch Loan & Trust Company or the receiver would be valueless. The defendants Hickenlooper defaulted, and the cross-defendants Stoven pleaded estoppel or laches, and the record reveals that under the rule laid down by this court in the case of *Fullerton* v. *Bailey,* supra, the statute of limitations would have run as between the defendant and cross-complainant Mrs. Zorn and the cross-defendants Stoven. The rule, however, is well settled in this jurisdiction that the defense of the statute of limitations, to be available as a legal defense, must be pleaded. While estoppel and laches under certain circumstances may be equitable defenses, the statute of limitations is a legal defense. Had the statute of limitations been pleaded on the part of the Stovens, it would have been an effective bar, as the state mortgage matured February 1, 1926, and cross-complain-

ant's complaint was not filed until February 25, 1932. In addition thereto, the record discloses that the Stovens disposed of their interest in the property June 18, 1921, and that the property passed by deed to the Fritsch Loan & Trust Company February 24, 1922. More than eleven years after the making of the state's mortgage by the Stovens, and more than six years after the date of its maturity, and more than four years after its cancellation and release upon the record had elapsed before the cross-complainant sought to assert any right to subrogation by her cross-complaint or notice given to any one by or on behalf of Mrs. W. Zorn that she claimed any such right. It is further to be observed that the testimony of Mrs. Zorn is far from definite as to any agreement between her and the Fritsch Loan & Trust Company, nor is that company the original debtor. No doubt Mrs. Zorn trusted Mr. Penner. The Walker Bros. bank draft used to pay the Stoven-State mortgage bears date the 19th day of May, 1927. There seems to have been ample time to have examined the record after Mrs. Zorn drew the money and before it was paid to the state land board. Further, the abstract showing the Martin mortgage and the deed from Hickenlooper to the Fritsch Loan & Trust Company showing that the company took the property subject to the Martin mortgage was delivered to Mrs. Zorn on or about June 1, 1927, and remained in her possession till the filing of the suit under consideration.

The trial court found that Mr. Penner "told defendant and cross-complainant, Mrs. W. Zorn, that it (the Fritsch Loan & Trust Company) was the owner of said real estate and water rights, and the whole thereof, and that the same was then subject only to said mortgage in favor of the State of Utah." There is some evidence in the record relating to the matter above quoted and found by the court; we are of the opinion the court permitted the finding to state more than the evidence actually warrants.

Other matters tend to show there was no contract of subrogation either expressed or implied, among which are: That

the mortgage of the Stovens to the state provided for interest at the rate of six per cent. per annum from date until maturity and at the rate of 8 per cent from maturity until paid; Mrs. Zorn's mortgage provided for interest at the rate of 7 per cent. per annum; this rate being paid while paid, and included in the judgment; the Martin mortgage includes only the real estate, and makes no reference to water rights; the certificates of water rights were delivered to and included in Mrs. Zorn's mortgage.

In view of our recording statute, the Stovens would be entitled to rely upon the fact of release, such release having been on record for more than four years after the maturity of their obligation and for approximately ten years after parting with the title to the property subject to the mortgage.

If the question were merely one affecting the Martin mortgage, the situation would be one that might well rest upon the doctrine that, where no one is injured by the mistake, assuming that there was a mistake, and no one has changed his position, in consequence of what has been done, even though a high degree of care has not been exercised, Martin could not be injured nor could he claim the benefit of the mistake not having changed his position in reliance thereon; but with the Stovens the situation is different; the defendant and cross-complainant cannot be subrogated to the provisions of the state's mortgage without putting the Stovens back to where they were at the time of the execution of the mortgage by them to the state.

It is often said equity will not rectify a mistake due to inexcusable negligence. In the instant case the statute charged the defendant and cross-complainant with notice in no uncertain terms. The statute (Rev. St. 1933, 78-3-2) says:

"Every conveyance, or instrument in writing affecting * * * required by law to be recorded in the office of the county recorder *shall,* from the time of filing the same with the recorder for record, *impart notice to all persons of the contents thereof; and* subse-

quent purchasers, mortgagees and lienholders *shall be deemed to purchase and take with notice.*" (Italics added.)

In addition to this statute, an abstract was admittedly delivered to and received by the defendant and cross-complainant containing two references to the mortgage and showing the chain of title. May it be said that equity will in the face of that record reach out its hand and revive an obligation "deemed" by the Stovens to have been paid and canceled for more than four years? To say under all circumstances that a failure to examine the record or to require an abstract and have it examined by some competent person would be an inexcusable neglect might be too harsh a rule. But that the statute must be considered and given some effect is manifest, unless such is done, why retain it. The statute is a beneficent one, and its value so manifest that ordinary diligence and dictates of safety in matters relating to recording documents require the observance of what is provided for one's benefit. The statute is evidently for the benefit of would-be purchasers and lienholders. Had the care which ordinary business prudence dictates in the average person been exercised in the instant case, the necessity of invoking the principles herein discussed could have been avoided.

In the case of *George* v. *Butler,* supra, no notice was afforded either because of the record or the abstract; the error in the recorded document having the effect of diverting attention away from, rather than to, the tract of land affected. The court did not discuss the effect of the statute in that case. George had actual notice of the first mortgage when the $1,000 was loaned, and the company holding the first mortgage had no actual notice when it loaned the $1,000 subsequent to the George second mortgage, yet the court gave Sutherland subrogation only to the extent of the first mortgage of the company, although Sutherland paid the amount of both liens of the company amounting to $3,500. No argument or line of reasoning is suggested for

not allowing subrogation for the full amount. If the statute relating to recording had any weight in the mind of the court, it does not appear.

We are compelled to the view that Mrs. Zorn is not entitled to subrogation as against C. H. Stoven and Florence M. Stoven on the state mortgage on the basis of the reasons heretofore stated. If subrogation may not be granted against the original mortgagors, of necessity the right of subrogation must fail entirely, and, while Martin may profit by the conclusion reached, he has some elements favorable to his position also, yet, standing alone, might not be sufficient to deny the right of subrogation to Mrs. Zorn.

Mr. Martin, however, has no lien or claim under his mortgage to the water rights, but his mortgage as to the real estate becomes superior to Mrs. Zorn's mortgage, and Mrs. Zorn's mortgage covers the water rights to which Martin has no claim. Therefore Martin is entitled to have his mortgage foreclosed and the real estate sold thereunder, and Mrs. Zorn is entitled to have the water rights sold under foreclosure of her mortgage. Each party hereto should pay his own costs on appeal.

This cause is remanded to the trial court, with directions to proceed as herein indicated. Such is the order.

STRAUP, C. J., and ELIAS HANSEN, FOLLAND, and EPHRAIM HANSON, JJ., concur.